U.S. COURTS

ELHADI BENKIRANE

**PLAINTIFF IN PRO PER**

305 N LINCOLN STREET

POST FALLS, ID 83854

benkirane.hadi@gmail.com

805.630.7445

JUN 20 2025

Rcvd_____ Filed _____ Time 9:54

STEPHEN W. KENYON

CLERK, DISTRICT OF IDAHO

2:25-CV-00314-DCN

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

ELHADI BENKIRANE,

Plaintiff,

v.

MAGELLAN HEALTHCARE, INC.; DAVID WELSH; DAVID TOVAR; and DOES 1-10,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS, CONSPIRACY, BREACH OF CONTRACT, INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS, DECLARATORY RELIEF, INJUNCTIVE RELIEF, MONETARY DAMAGES, AND RESTITUTION**

- Plaintiff **ELHADI BENKIRANE ("Plaintiff"),** as owner and operator of **WHR INTENSIVE OUTPATIENT PROGRAM ("WHR IOP"),** a credentialed behavioral health provider serving vulnerable individuals with substance use disorders in Idaho, respectfully brings this federal civil rights action against Defendants for their systematic pattern of constitutional violations, retaliatory conduct, and bad faith dealing that has deprived Plaintiff of his due process rights, equal protection under law, and contractual rights while causing substantial harm to his practice, livelihood, and the patients he serves.

- Plaintiff complains against Defendants and alleges as follows:

## I. INTRODUCTION

This civil rights action arises from Defendants' systematic pattern of retaliation, bad faith dealing, and constitutional violations in connection with the wrongful termination of Plaintiff's network provider agreement for his credentialed behavioral health practice, WHR IOP. Defendants, acting under color of state law as administrators of Idaho's Medicaid behavioral health program, engaged in a coordinated scheme to deprive Plaintiff of due process rights, equal protection under law, and contractual rights through fraudulent misrepresentation, selective enforcement, and ongoing retaliatory conduct.

Defendants orchestrated a deceptive "audit ambush" by falsely representing a routine site visit as a casual meeting, violated their own written policies requiring proper notice and procedural safeguards, terminated Plaintiff's contract without adequate opportunity to be heard despite rapid remediation of identified deficiencies, and continue to this day, including as recently as June 10, 2025 to make false statements to patients designed to damage Plaintiff's reputation and business relationships.

This action seeks declaratory, injunctive, and monetary relief for violations of 42 U.S.C. §§ 1983, 1985, and 1981, as well as state law claims for breach of contract, breach of the covenant of good faith and fair dealing, and intentional interference with business relationships.

## II. PARTIES

[1] Plaintiff **ELHADI BENKIRANE** is an individual residing in Post Falls, Idaho, and is the owner and operator of WHR IOP, a credentialed behavioral health provider doing business in Idaho.

[2] Defendant **MAGELLAN HEALTHCARE, INC. ("Magellan")** is a Delaware corporation doing business in Idaho as a managed care organization

- 1 -

under contract with the Idaho Department of Health and Welfare to administer the Idaho Behavioral Health Plan.

[3] Defendant **DAVID WELSH** is an individual who, at all relevant times, served as Chief Executive Officer for Magellan Healthcare, Inc., and acted under color of state law in his individual and official capacities.

[4] Defendant **DAVID TOVAR** is an individual who, at all relevant times, served as Network Director for Magellan Healthcare, Inc., and acted under color of state law in his individual and official capacities.

[5] Defendants DOES 1-10 are individuals whose true names are unknown to Plaintiff but who participated in the conduct alleged herein and acted under color of state law.

### III. JURISDICTION AND VENUE

[6] This Court has subject matter jurisdiction over this action pursuant to:

- [a] 28 U.S.C. § 1331 (federal question jurisdiction) as this action arises under the laws of the United States, specifically 42 U.S.C. §§ 1983, 1985, and 1981;
- [b] 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction);
- [c] The amount in controversy exceeds $150,000, exclusive of interest and costs.

[7] This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 as they form part of the same case or controversy.

[8] Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Idaho, and Defendants conduct substantial business in this District.

[9] **Standing:** Plaintiff has standing to bring this action as he suffered concrete and particularized injury directly traceable to Defendants' conduct that is redressable by judicial relief.

# IV. FACTUAL ALLEGATIONS

## A. Background and Contractual Relationship

[10] Plaintiff operates WHR IOP as a credentialed behavioral health provider serving individuals with substance use disorders and mental health conditions in Idaho.

[11] On or around September 2024, Plaintiff entered into a Network Provider Agreement with Defendants to provide behavioral health services to Idaho Behavioral Health Plan members through his practice, WHR IOP.

[12] Defendants operate under contract with the Idaho Department of Health and Welfare and acts under color of state law in administering Medicaid and other state-funded behavioral health benefits.

[13] As a condition of network participation, Plaintiff and Defendants were required to comply with Defendants policies and procedures as outlined in the Idaho Behavioral Health Plan Provider Handbook.

## B. Pattern of Bad Faith Dealing and Retaliation

[14] From the inception of the contractual relationship, Defendants engaged in a systematic pattern of bad faith dealing, including:

- [a] Delaying payments for authorized services for months without justification.
- [b] Denying payment to third party biller without remedy or proper justification.
- [c] Defendant only agreed to pay the billed claims for services rendered after Plaintiff was forced to threaten litigation, demonstrating a deliberate refusal to fulfill contractual obligations until confronted with legal action.

[15] From October 2024 through April 2025, despite continuous billing and approved authorizations, Defendants failed to reimburse Plaintiff for services

totaling upwards of approximately $160,000 for services rendered between October 2024 and Jan 2025.

[16] When Plaintiff demanded payment for services rendered, Defendants conduct became increasingly retaliatory and punitive.

### C. Fraudulent Misrepresentation and Coordinated Audit Ambush

[17] On or around late April 2025, Magellan representatives, specifically Rebekah Nansel, contacted Plaintiff's team member by telephone requesting a "casual meeting" with Plaintiff because they claimed to be "in town" for other business.

[18] **WHO**: Rebekah Nansel, Amy Topp, Erin Miller; **WHAT**: Falsely represented the purpose of this initial meeting as casual when it was actually a coordinated formal audit; **WHEN**: On or around April 2025 call, May 1, 2025 meeting; **WHERE**: Plaintiff's facility at 305 N. Lincoln St., Post Falls, Idaho; **HOW**: By telephone misrepresentation followed by surprise deployment of multiple audit team members.

[19] Defendants deliberately concealed that this would be a formal audit involving multiple team members with a predetermined agenda to find grounds for termination, knowing that such disclosure would allow Plaintiff to adequately prepare and potentially avoid the targeted enforcement action.

[20] This misrepresentation violated Defendants own written policies outlined in the Idaho Behavioral Health Plan Provider Handbook requiring "two weeks' advance notice for any routine visit" and requiring them to "advise you of what you need to do to prepare for the site visit."

[21] On May 1, 2025, Defendants conducted a surprise coordinated audit with multiple team members, including Rebekah Nansel, Amy Topp, and Erin Miller, in direct violation of their own procedural requirements and contrary to the casual nature represented.

- 4 -

[22] The audit was a premeditated ambush designed to create justification for termination in retaliation for WHR IOP's demands for payment, evidenced by the coordinated team deployment that required advance planning contrary to the spontaneous "casual meeting" representation.

[23] Upon information and belief, Defendants coordinated internally through emails, phone calls, and planning meetings to arrange this fraudulent audit, demonstrating premeditation and intent to deceive.

[24] On May 12, 2025, Defendants conducted another coordinated audit with multiple team members, including Rebekah Nansel, Erin Miller, Tabatha Haywood, David Tovar, and Dr. Sam Pullen in direct violation of their own procedural requirements and contrary to the casual nature represented.

### D. Denial of Due Process and Procedural Violations

[25] On May 19, 2025, Defendants- specifically **David Tovar** issued a deficiency letter identifying various alleged violations.

[26] Within a week, Plaintiff diligently remediated all identified deficiencies, hiring additional qualified staff and implementing all required changes preemptively and without direction from Defendants.

[27] Plaintiff provided continuous email updates to Defendants documenting the completion of corrective actions despite Defendants not requiring any corrections and representing that there was no Corrective Action Plan or anything that needed to be done until they had a "huddle" amongst themselves.

[28] Despite knowing that Plaintiff had completed all corrective actions, Defendants terminated the contract on May 27, 2025, without allowing adequate time for review or providing meaningful opportunity to be heard.

[29] Defendants own policies require "collaboratively partnering with providers" and providing reasonable opportunity to cure deficiencies before termination.

### E. Selective Enforcement and Discriminatory Treatment

- 5 -

[30] During communications on May 23, 2025, Defendant David Tovar expressed surprise when informed about other providers operating with identical or worse practices, stating there was "no oversight of these other programs" and, "an investigation would have to be completed."

[31] Defendants statements demonstrate that Plaintiff was subjected to disproportionate scrutiny compared to other network providers with identical or worse practices.

[32] Plaintiff was the only provider subjected to this type of targeted audit while other providers with documented violations and public complaints continue operating without similar enforcement action.

[33] This selective enforcement constitutes discriminatory treatment in violation of equal protection principles.

### F. Denial of Appeal Rights and Administrative Remedies

[34] Following the wrongful termination, Plaintiff timely filed an administrative appeal on May 27, 2025 pursuant to Defendants written policies and procedures.

[35] Despite Defendants written policy requiring response to provider appeals within thirty (30) business days, Defendants completely ignored Plaintiff's appeal and failed to provide any response whatsoever.

[36] Plaintiff and his staff diligently followed up with Defendants via phone calls, voicemails, internal instant messages and emails to obtain a contact for the appeal and to help expedite the process but Defendants refuse to communicate or correspond with Plaintiff or his staff despite the multiple (over 40 times in approximately 23 days) attempts.

[37] The complete failure to respond to, or process Plaintiff's appeal demonstrates Defendants' deliberate indifference to their own written policies and constitutional requirements.

### G. Post-Termination Retaliation and Continued Bad Faith

[38] On June 6, 2025, just ten (10) days after wrongful termination, Defendants deliberately excluded Plaintiff from the Provider Advisory Committee by sending him a Zoom meeting invitation with all other providers, then canceling only Plaintiff's invitation approximately ten minutes later while allowing all other providers to remain invited. This exclusion occurred without any written procedures, notice, or opportunity to be heard, despite Defendants Provider Handbook containing no policies governing Provider Advisory Committee membership or removal procedures, constituting additional violations of 42 U.S.C. § 1983 for deprivation of due process and equal protection rights under the Fourteenth Amendment, and further evidence of ongoing conspiracy under 42 U.S.C. § 1985 and escalating retaliation.

[39] Demonstrating that their retaliatory conduct did not cease with contract termination, on June 10, 2025, a former patient of Plaintiff's practice contacted Defendants requesting authorization to return to WHR IOP for continued substance abuse treatment services.

[40] In a deliberate act of ongoing retaliation and misrepresentation, Defendants representatives falsely told the patient that "WHR terminated the contract with Magellan," deliberately misrepresenting that Plaintiff had voluntarily terminated the relationship rather than acknowledging Defendant's wrongful termination.

[41] This false statement, made on June 10, 2025 constitutes fresh evidence of Defendants' ongoing pattern of bad faith and demonstrates:

- [a] Continued retaliation against Plaintiff even after contract termination;
- [b] Deliberate misrepresentation designed to damage Plaintiff's reputation;
- [c] Active interference with Plaintiff's ability to rebuild business relationships;
- [d] Consciousness of guilt regarding the wrongful nature of the termination;

- **[e]** Willful disregard for the welfare of vulnerable patients seeking treatment.

**[42]** Defendant's representative, Sharron Williams, willfully ignored Plaintiff's repeated (over 10 times) inquiries regarding an active escalation, while deceptively assuring another agent she would respond—intentionally misleading all parties and obstructing resolution through calculated bad faith.

**[43]** This ongoing conduct proves that Defendants' retaliatory animus continues unabated and that injunctive relief is necessary to prevent further harm.

## H. State Action and Color of Law

**[44]** At all relevant times, Defendants acted under color of state law in the following respects:

- **[a]** Magellan operates under formal contract with the Idaho Department of Health and Welfare to administer the Idaho Behavioral Health Plan;
- **[b]** Defendants exercise governmental authority over Medicaid provider networks;
- **[c]** Defendants implement state policy regarding behavioral health services;
- **[d]** Individual defendants Welsh and Tovar acted pursuant to state authority delegated through Magellan's governmental contract;
- **[e]** The conduct alleged herein was undertaken in performance of Defendants' governmental functions.

## I. Immediate and Ongoing Damages

**[45]** As a direct result of Defendants' wrongful conduct, Plaintiff was forced to:

- **[a]** Cease operations of his practice immediately;
- **[b]** Terminate employment of over 14 staff members;
- **[c]** Discontinue services to vulnerable clients with substance use disorders;

- **[d]** Provide continued services without compensation to ensure client safety;
- **[e]** Abandon patient relationships built over months of treatment;
- **[f]** Cancel scheduled appointments and treatment programs;
- **[g]** Forfeit investments in Magellan-specific technology and systems;
- **[h]** Lose referral relationships with other healthcare providers.

[46] Plaintiff has suffered substantial financial damages including:

- **[a]** Lost revenue from May 27, 2025 to present totaling upwards of approximately $95,000 monthly;
- **[b]** Unpaid claims and accounts receivable owed by Defendants totaling upwards of approximately $200,000;
- **[c]** Emergency costs of staff hiring, training, and remediation efforts totaling upwards of approximately $25,000;
- **[d]** Wasted investments in Magellan-specific billing systems and technology totaling upwards of approximately $10,000;
- **[e]** Increased operational costs due to sudden network termination;
- **[f]** Lost goodwill and patient relationships;
- **[g]** Costs of seeking alternative network partnerships;
- **[h]** Marketing and advertising expenses to rebuild practice reputation;
- **[i]** Professional development and training costs rendered worthless;
- **[j]** Interest and financing costs due to cash flow disruption;
- **[k]** Administrative and legal costs related to wrongful termination.

[47] Plaintiff has suffered severe emotional distress, mental anguish, and damage to professional reputation, including:

- **[a]** Anxiety and stress from sudden loss of livelihood;
- **[b]** Humiliation from false statements made to patients and community;
- **[c]** Professional embarrassment from perceived abandonment of patients;

- [d] Mental anguish from inability to serve vulnerable populations;
- [e] Damage to professional standing in the healthcare community;
- [f] Loss of professional confidence and career advancement opportunities.

[48] The wrongful termination has caused ongoing and future damages including:

- [a] Diminished earning capacity and future income potential;
- [b] Difficulty obtaining future network provider agreements;
- [c] Permanent damage to professional reputation and referral relationships;
- [d] Ongoing interference with business relationships and opportunities;
- [e] Continuing costs to rebuild practice and patient base;
- [f] Long-term impact on ability to serve substance abuse patients in Idaho.

## V. CAUSES OF ACTION

## COUNT I: VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

## (Procedural Due Process under 14th Amendment)

[49] Plaintiff incorporates by reference all previous allegations.

[50] At all relevant times, Defendants acted under color of state law in administering the Idaho Behavioral Health Plan pursuant to contract with the Idaho Department of Health and Welfare.

[51] **Municipal/Corporate Liability:** Defendant's violations resulted from official policy, widespread practice, or deliberate indifference by final policymaking authority, including policies that permitted selective enforcement and retaliation against providers who demanded contractual payments.

[52] Plaintiff had a protected property interest in the contractual relationship and network participation with Magellan.

[53] Defendants deprived Plaintiff of this protected interest without due process of law by:

- [a] Failing to provide adequate notice of the true nature and scope of investigative proceedings;

- [b] Conducting a fraudulent "casual meeting" that was actually a coordinated audit;
- [c] Terminating the contract without meaningful opportunity to be heard;
- [d] Violating their own written procedural safeguards and policies;
- [e] Failing to allow reasonable time for review of corrective actions;
- [f] Completely ignoring Plaintiff's administrative appeal in violation of written policies;
- [g] Making false statements to patients about the nature of the contract termination.

[54] Defendants' actions were objectively unreasonable and violated clearly established federal law.

[55] **Qualified Immunity:** The individual defendants Welsh and Tovar violated clearly established federal law that a reasonable official would have known, specifically the right to adequate notice and opportunity to be heard before termination of a protected property interest, and qualified immunity does not apply.

[56] As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages including loss of income, business interruption, emotional distress, reputational harm, and violation of constitutional rights.

<strong>Legal Authority:</strong>

- *Mathews v. Eldridge*, 424 U.S. 319 (1976) (procedural due process requirements)
- *Board of Regents v. Roth*, 408 U.S. 564 (1972) (property interest in contractual relationships)
- *Goldberg v. Kelly*, 397 U.S. 254 (1970) (right to adequate notice and hearing)
- *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (pre-termination procedures)

- *Goss v. Lopez*, 419 U.S. 565 (1975) (minimum due process requirements)
- *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (adequate notice standards)

## COUNT II: VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

### (Substantive Due Process under 14th Amendment)

[57] Plaintiff incorporates by reference all previous allegations.

[58] Defendants' conduct in orchestrating a fraudulent audit ambush and retaliatory termination was so arbitrary, capricious, and oppressive as to shock the conscience.

[59] Defendants' actions were not rationally related to any legitimate government purpose but were motivated by retaliation and animus.

[60] The coordinated deception and immediate termination after corrective actions constitutes conduct that "shocks the conscience" under substantive due process analysis.

### Legal Authority on Retaliation:

- *Perry v. Sindermann*, 408 U.S. 593 (1972) (retaliation for exercising constitutional rights)
- *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) (burden-shifting in retaliation cases)
- *Hartman v. Moore*, 547 U.S. 250 (2006) (retaliatory prosecution standards)
- *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ("shocks the conscience" standard)
- *Collins v. Harker Heights*, 503 U.S. 115 (1992) (arbitrary state action)
- *Daniels v. Williams*, 474 U.S. 327 (1986) (deliberate indifference standard)
- *United States v. Salerno*, 481 U.S. 739 (1987) (substantive due process analysis)

## COUNT III: CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1985)

[61] Plaintiff incorporates by reference all previous allegations.

[62] Defendants conspired among themselves to deprive Plaintiff of equal protection of the laws and equal privileges and immunities under the laws.

[63] The conspiracy involved coordinated conduct including:

- [a] Fraudulent misrepresentation of the purpose of the May 1, 2025 and may 12, 2025 meetings;
- [b] Coordinated audit team deployment without proper notice;
- [c] Predetermined plan to terminate contract regardless of corrective actions;
- [d] Selective enforcement compared to similarly situated providers;
- [e] Ongoing false statements to patients designed to damage Plaintiff's reputation and prevent business recovery.

[64] The conspiracy continues post-termination, as evidenced by the false statement made to a patient on June 10, 2025, demonstrating Defendants' ongoing commitment to harm Plaintiff's business and civil rights.

[65] Defendants acted with discriminatory animus and intent to harm Plaintiff's business and civil rights.

### Legal Authority:

- *Griffin v. Breckenridge*, 403 U.S. 88 (1971) (§ 1985 conspiracy claims)
- *Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985) (business conspiracy under § 1985)
- *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (conspiracy requirements)
- *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825 (1983) (§ 1985 elements)
- *Kush v. Rutledge*, 460 U.S. 719 (1983) (conspiracy to deprive civil rights)

## COUNT IV: EQUAL PROTECTION VIOLATION (42 U.S.C. § 1983 under 14th Amendment)

[66] Plaintiff incorporates by reference all previous allegations.

[67] Defendants subjected Plaintiff to selective enforcement of policies and procedures not applied to similarly situated providers.

[68] Defendants' differential treatment was not rationally related to any legitimate government purpose but was motivated by retaliation for Plaintiff's demands for contractual payments.

[69] This selective enforcement constitutes discriminatory treatment violating fundamental equal protection principles established in federal law.

**Legal Authority:**

- *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (class-of-one equal protection)
- *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995) (selective enforcement)
- *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (arbitrary enforcement of laws)
- *Snowden v. Hughes*, 321 U.S. 1 (1944) (discriminatory state action)

## COUNT V: DEPRIVATION OF RIGHTS UNDER COLOR OF LAW (42 U.S.C. § 1981)

[70] Plaintiff incorporates by reference all previous allegations.

[71] Defendants interfered with Plaintiff's right to make and enforce contracts on the same terms as other providers.

[72] The selective enforcement and discriminatory treatment violated Plaintiff's rights to equal treatment in contractual relationships.

**Legal Authority:**

- *McDonald v. Santa Fe Trail Trans. Co.*, 427 U.S. 273 (1976) (§ 1981 protections)
- *Runyon v. McCrary*, 427 U.S. 160 (1976) (contractual rights under § 1981)

- *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) (§ 1981 scope)
- *Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) (§ 1981 discrimination)
- *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) (contract formation and enforcement)

## COUNT VI: BREACH OF CONTRACT (Idaho State Law)

[73] Plaintiff incorporates by reference all previous allegations.

[74] A valid contract existed between the parties whereby Defendant Magellan was obligated to follow its own written policies and procedures.

[75] Defendants materially breached the contract by:

- [a] Failing to follow required site visit procedures;
- [b] Violating progressive enforcement policies;
- [c] Terminating provider contract without adequate cause or proper procedure;
- [d] Failing to pay for authorized services totaling upwards of approximately $160,000;
- [e] Making false statements about the termination to patients.

[76] Plaintiff performed all obligations under the contract and completed all required corrective actions.

### Legal Authority:

- *Idaho Power Co. v. Westinghouse Elec. Corp.*, 693 P.2d 1203 (Idaho 1984)
- *Taylor v. McNichols*, 243 P.3d 642 (Idaho 2010) (material breach standards)
- *Opportunity, LLC v. Ossewarde*, 297 P.3d 1096 (Idaho 2013) (contract interpretation)
- *Magic Lantern Productions v. Dolsay*, 846 P.2d 1085 (Idaho 1993) (breach elements)

- 15 -

## COUNT VII: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (Idaho Code § 28-1-203)

[77] Plaintiff incorporates by reference all previous allegations.

[78] Every contract contains an implied covenant of good faith and fair dealing.

[79] Defendants breached this covenant by:

- [a] Engaging in deceptive conduct regarding the May 1, 2025 and May 12, 2025 meetings;
- [b] Pursuing retaliatory termination for exercising contractual rights;
- [c] Applying policies selectively and discriminatorily;
- [d] Failing to act in good faith during the remediation process;
- [e] Making false statements to patients about the contract termination.

**Legal Authority:**

- *Idaho First Nat'l Bank v. Bliss Valley Foods*, 824 P.2d 841 (Idaho 1991)
- *Metcalf v. Intermountain Gas Co.*, 778 P.2d 744 (Idaho 1989)
- *Bad Elk Ranch Hunting Club, Inc. v. Hidden Valley Ranch, LLC*, 497 P.3d 378 (Idaho 2021)
- *Beco Corp. v. City of Idaho Falls*, 124 P.3d 134 (Idaho 2005) (good faith standards)
- *Foreman v. Davis*, 835 P.2d 523 (Idaho 1992) (implied covenant scope)

## COUNT VIII: INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS (Idaho Code § 6-2104)

[80] Plaintiff incorporates by reference all previous allegations.

[81] Defendants intentionally interfered with Plaintiff's existing and prospective business relationships with clients, referral sources and staff.

[82] The interference was wrongful and without justification, including making false statements to patients about the nature of the contract termination, most recently occurring on June 10, 2025.

[83] Defendants knew their conduct would harm Plaintiff's business relationships and deliberately continued such interference even after contract termination to prevent Plaintiff's business from recovering.

**Legal Authority:**

- *Highland Enterprises, Inc. v. Barker*, 986 P.2d 996 (Idaho 1999)

- *Cantwell v. City of Boise*, 692 P.2d 739 (Idaho 1984) (interference elements)

- *Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 177 P.3d 955 (Idaho 2008)

- *Idaho Forest Industries, Inc. v. Hayden Lake Watershed Improvement Dist.*, 666 P.2d 391 (Idaho 1983)

## COUNT IX: CONSPIRACY TO INTERFERE WITH BUSINESS RELATIONS (Idaho State Law)

[84] Plaintiff incorporates by reference all previous allegations.

[85] In the alternative, if the Court finds that Defendants did not act under color of state law for purposes of federal conspiracy claims, Plaintiff pleads state law conspiracy claims for the same coordinated conduct alleged herein.

[86] Defendants conspired to interfere with Plaintiff's business relationships through coordinated misrepresentation, fraudulent audit procedures, and ongoing false statements to patients and the community.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

### A. ENTRY OF JUDGMENT

[1] Enter judgment in favor of Plaintiff and against Defendants on all counts;

### B. DECLARATORY RELIEF

[2] Declare that Defendants' termination of Plaintiff's network provider agreement violated Plaintiff's constitutional rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment;

[3] Declare that Defendants' conduct violated 42 U.S.C. §§ 1983, 1985, and 1981;

[4] Declare that Defendants breached their contractual obligations and the covenant of good faith and fair dealing;

[5] Declare that Defendants' policy of selective enforcement and retaliatory conduct is unlawful and unconstitutional;

## C. INJUNCTIVE RELIEF

[6] Issue a preliminary and permanent injunction requiring Defendants to:

- [a] **Immediately** reinstate Plaintiff's practice (WHR IOP) to active network status with full privileges immediately upon order of the court;
- [b] Process and pay all outstanding claims for services rendered upon demand;
- [c] **Immediately** cease all retaliatory conduct against Plaintiff;
- [d] Apply network policies uniformly across all providers;
- [e] Implement proper procedural safeguards for future enforcement actions within 60 days;
- [f] **Immediately** provide written notice to all staff regarding prohibition on false statements about Plaintiff;
- [g] Issue written corrections within immediately to any patients who received false information about contract termination;
- [h] **Immediately** prohibit any negative communications about Plaintiff to patients, providers, or third parties;
- [i] Restore Plaintiff's access to all network systems, portals, and billing platforms within 30 days;

- [j] Reinstate all prior authorizations and treatment approvals affected by wrongful termination immediately.

[7] Issue specific injunctive relief prohibiting Defendants from:

- [a] Making any false or misleading statements about Plaintiff or his practice;
- [b] Engaging in any future retaliatory conduct against Plaintiff for filing this lawsuit;
- [c] Interfering with Plaintiff's patient relationships, referral relationships or business opportunities;
- [d] Applying enforcement standards to Plaintiff different from other similarly situated providers;
- [e] Conducting unannounced audits or site visits without proper notice as required by their own policies;
- [f] Terminating or threatening termination without following due process procedures;
- [g] Delaying or withholding payment for authorized services as retaliation;
- [h] Sharing any negative information about Plaintiff with other insurance companies or providers.

[8] Issue mandatory injunctive relief requiring Defendants to:

- [a] Establish and implement uniform, written standards for provider enforcement actions within 90 days;
- [b] Provide advance written notice of all site visits as required by their handbook;
- [c] Allow reasonable cure periods for any identified deficiencies;
- [d] Apply progressive enforcement measures before termination;
- [e] Process and respond to all provider appeals within required timeframes;

- **[f]** Maintain accurate records of all provider enforcement actions for comparison and review;
- **[g]** Conduct annual training for all staff on constitutional rights of network providers.

### D. MANDAMUS RELIEF

**[9]** Issue a writ of mandamus compelling Defendants to:

- **[a]** Follow their own written policies and procedures;
- **[b]** Provide proper notice and opportunity to be heard before termination;
- **[c]** Conduct compliance reviews in accordance with published standards;

### E. MONETARY DAMAGES

**[10]** Award compensatory damages in an amount to be proven at trial, including but not limited to:

- **[a]** Lost profits and business income from May 27, 2025 to present and continuing (upwards of approximately $95,000 monthly);
- **[b]** Unpaid claims and accounts receivable totaling upwards of approximately $200,000;
- **[c]** Business interruption losses and continuing operational disruption;
- **[d]** Emergency costs of staff hiring, training, and remediation efforts totaling upwards of approximately $25,000;
- **[e]** Lost business opportunities and future earning capacity;
- **[f]** Costs of providing continued client services without compensation;
- **[g]** Wasted investments in Magellan-specific technology, billing systems, and infrastructure totaling upwards of approximately $10,000;
- **[h]** Marketing, advertising, and business development costs to rebuild practice and repair reputation;
- **[i]** Professional development, training, and certification costs rendered worthless;

- 20 -

- [j] Administrative and legal costs related to wrongful termination and ongoing dispute;
- [k] Interest and financing costs due to cash flow disruption;
- [l] Increased operational costs and inefficiencies caused by sudden network termination;
- [m] Costs of seeking and establishing alternative network relationships;
- [n] Lost referral relationships and professional goodwill;
- [o] Diminished value of practice and professional reputation.

[11] Award damages for emotional distress and mental anguish including:

- [a] Severe anxiety, stress, and depression caused by sudden loss of livelihood;
- [b] Humiliation and embarrassment from false statements to patients and community;
- [c] Mental anguish from inability to serve vulnerable patients in need;
- [d] Professional humiliation and damage to reputation in healthcare community;
- [e] Ongoing stress and anxiety from financial uncertainty and business disruption;
- [f] Loss of professional confidence and career satisfaction.

[12] Award future damages including:

- [a] Diminished earning capacity and future income potential;
- [b] Ongoing costs to rebuild practice, patient base, and professional relationships;
- [c] Future lost opportunities and business relationships;
- [d] Continuing impact on ability to serve substance abuse patients in Idaho;
- [e] Long-term reputational damage and professional consequences.

- 21 -

[13] Award punitive damages for Defendants' willful, wanton, and malicious conduct in an amount sufficient to:

- [a] Punish Defendants for their egregious violations of constitutional and civil rights;
- [b] Deter similar future conduct against other healthcare providers;
- [c] Send a clear message that retaliatory conduct will not be tolerated;
- [d] Compensate for the particularly egregious nature of targeting vulnerable patient populations;
- [e] Reflect the ongoing nature of the retaliation continuing through the filing of this complaint.

## F. RESTITUTION AND DISGORGEMENT

[14] Order restitution of all amounts improperly withheld from Plaintiff;

[15] Order disgorgement of any benefits Defendants received from their unlawful conduct;

## G. SPECIFIC PERFORMANCE

[16] Order specific performance of Defendants' contractual obligations, including:

- [a] Payment of all authorized claims;
- [b] Adherence to written policies and procedures;
- [c] Implementation of corrective action plans;

## H. PROSPECTIVE RELIEF AND COMPLIANCE MONITORING

[17] Order prospective relief including:

- [a] Independent 3rd party monitoring of Defendants' provider relations practices;
- [b] Regular reporting to the Court on compliance with network policies;
- [c] Implementation of training programs for Defendants' staff on constitutional rights of providers;
- [d] Establishment of uniform enforcement standards and procedures;

- 22 -

- **[e]** Quarterly compliance audits of Defendants' provider termination practices;
- **[f]** Required documentation and justification for all future provider enforcement actions;
- **[g]** Independent oversight of Defendants' appeals process to ensure timely responses;
- **[h]** Creation of provider grievance committee with independent oversight;
- **[i]** Annual reporting to the Court on provider termination statistics and procedures.

## I. EXPEDITED DISCOVERY

**[18]** Order expedited discovery given the ongoing nature of the harm and continuing retaliation, including:

- **[a]** Production of all internal communications regarding Plaintiff's audit and termination;
- **[b]** Production of comparative enforcement data for all providers in Defendants' network;
- **[c]** Depositions of key decision-makers within 60 days of service;

## J. COSTS AND FEES

**[19]** Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 for prevailing party in civil rights action, Idaho Code § 12-121, and other applicable law;

**[20]** Award expert witness fees, court costs, and litigation expenses;

## K. INTEREST

**[21]** Award pre and post judgment interest as allowed by law on all monetary awards;

## L. ADDITIONAL RELIEF

[22] Grant such other and further relief as the Court deems just, proper, and equitable under the circumstances, including any relief authorized by 28 U.S.C. § 2202;

[23] Retain jurisdiction over this matter to ensure compliance with any orders entered.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution, Plaintiff hereby demands a trial by jury on all issues so triable by right.

**Respectfully submitted,**

**ELHADI BENKIRANE**
Pro Se
305N Lincoln St.
Post Falls, ID 83854
benkirane.hadi@gmail.com
805.630.7445

**VERIFICATION**

I, ELHADI BENKIRANE, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20 day of June, 2025, at Post Falls, Idaho.

**ELHADI BENKIRANE**

Elhadi Benkirane

- 24 -