Elhadi Benkirane
7506 Baerss Rd,
Riverside, California 92507
Telephone: (562) 391-1442
Benkirane.hadi@gmail.com
Plaintiff, Pro Se

# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| ELHADI BENKIRANE, | Case No. 2:25-cv-00314-DCN |
| *Plaintiff,* | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| Magellan Healthcare Inc., David Welsh, David Tovar, and Does 1-10, | |
| *Defendants.* | *Judge David C. Nye* |

## I. INTRODUCTION

1. Rule 12(b)(6) requires only plausibility. The First Amended Complaint plausibly alleges that Defendants retaliated against Plaintiff for engaging in protected petitioning activity under the First Amendment.

2. Plaintiff sues in his individual capacity. Every claim arises from personal injuries (loss of employment, reputational harm, and exclusion from a professional body), independent of any corporate contract between WHR IOP LLC and Magellan. Whether Magellan qualifies as a state actor under 42 U.S.C. § 1983 is a fact-intensive question unresolvable at the

pleading stage. Defendants' motion invites the Court to weigh evidence and choose between competing inferences, a task reserved for discovery and trial. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3. On March 27, 2025, Plaintiff, in his individual capacity, sent a formal pre-litigation communication to Magellan asserting his constitutional rights and complaining of selective enforcement and unfair treatment in the administration of the IBHP. This communication constitutes protected petitioning activity.

4. Within sixty-one days, Magellan (which had conducted no prior audits or enforcement actions against WHR) initiated a series of enforcement actions culminating in same-day termination on May 27, 2025, hours after Plaintiff submitted full remediation of all alleged deficiencies.

5.  These adverse actions were accompanied by multiple procedural irregularities: the termination letter was addressed personally to "Elhadi Benkirane, OWNER"; the appeal was routed to Welsh, who signed the termination; Magellan staff falsely told patients that WHR had voluntarily terminated; and Plaintiff was removed from the Provider Advisory Committee while Tovar, who operated a competing clinic, remained.

## III. LEGAL STANDARD

6. A complaint survives Rule 12(b)(6) if it contains sufficient factual matter to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts well-pleaded allegations as true and draws reasonable inferences in the plaintiff's favor. Pro se pleadings are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## IV. ARGUMENT

**A.  Plaintiff Has Standing to Assert Personal Injuries Independent of WHR's Contractual Claims.**

7. Plaintiff alleges three distinct, concrete injuries in his individual capacity independent of any corporate harm to WHR IOP LLC.

8. First, Plaintiff's termination as Executive Director constitutes a direct personal injury. WHR terminated Plaintiff on September 1, 2025, expressly attributing that decision to loss of the Magellan contract (FAC ¶¶ 43.3, 86). Plaintiff's livelihood depended on the clinic's operation; the Magellan contract provided the overwhelming majority of WHR's revenue. Plaintiff suffered over $500,000 in personal economic damages, reflecting lost salary, lost equity value, and lost future earning capacity as Executive Director of an operating behavioral health clinic, calculated based on WHR's revenue, Plaintiff's compensation, and the clinic's projected growth before termination. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 (2006) (individual may assert § 1983 claims arising from deprivation of rights even where a corporate entity was the contracting party, so long as plaintiff's own rights were violated).

9. Second, Defendants removed Plaintiff by name from the Provider Advisory Committee on June 6, 2025 (Exhibit I), with Tovar copied. PAC minutes confirm no notice was provided (Exhibit P). This constitutes an independent personal injury.

10. Third, Defendants made false statements to patients that WHR "voluntarily terminated" (FAC ¶¶ 47-48). The termination letter was addressed to "Elhadi Benkirane, OWNER," not to WHR IOP LLC (Exhibit J). These statements damaged Plaintiff's personal reputation.

11. Defendants' reliance on *Partout v. Harper*, 183 P.3d 771 (Idaho 2008), is misplaced. *Partout* addressed third-party contract enforcement. Here, Plaintiff asserts personal constitutional and tort claims (wrongful termination of employment, exclusion from a professional body, and reputational harm). *Partout*'s incidental beneficiary analysis is inapplicable.

## B. Defendants' Arbitration Argument Fails Because Plaintiff's Personal Claims Fall Outside the Agreement's Scope.

12. This argument fails for three reasons.

13. First, this Court resolved the arbitration question in its March 27, 2026, Order (Dkt. 31), noting that not all claims would be subject to arbitration. Plaintiff's § 1983 and tort claims are statutory and common law claims, not contract claims.

14. Second, Plaintiff is not a party to the Agreement. An arbitration clause between corporate entities cannot compel arbitration of a third party's personal constitutional and tort claims.

15. Third, Plaintiff's claims arise from constitutional violations and tortious interference with his personal employment, not from the Agreement's terms.

## C. Count One: First Amendment Retaliation Survives Dismissal.

16. A First Amendment retaliation claim requires protected activity, an adverse action that would chill a person of ordinary firmness, and causation. *Coszalter v. City of Salem*, 320 F.3d 968, 974 (9th Cir. 2003).

17. The Petition Clause protects pre-litigation communications asserting anticipated legal action. *BE&K Construction Co. v. NLRB*, 536 U.S. 516, 524-25 (2002) (petitioning courts, including anticipatory pre-litigation communications, is core First Amendment activity). Plaintiff's March 27, 2025, communication constitutes protected petition activity (Exhibit N). Before Plaintiff's protected communication, Magellan conducted no prior audits or enforcement actions against WHR during the relevant period.

18. The cumulative adverse actions would deter any person of ordinary firmness: unannounced audits misrepresented as "informal" yet escalated after staff challenged selective enforcement; a deficiency letter signed by Tovar while he managed a competing clinic; same-morning termination despite documented compliance (¶¶ 19-20 of the Statement of Facts); appeal routed to Welsh eliminating independent review; false statements to patients; and PAC removal four days after Tovar filed his competing clinic's annual report. Each of these actions, individually, would deter a reasonable provider from

asserting constitutional rights or filing legal complaints against a sole-source Medicaid administrator with exclusive market control over provider participation.

19. No enforcement preceded the protected communications. That before-and-after contrast supports retaliatory causation. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995). Once a plaintiff shows that protected activity was a substantial or motivating factor, the burden shifts to the defendants to show they would have taken the same action regardless. *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287 (1977). At 12(b)(6), Defendants cannot meet that burden: WHR was in good standing six weeks before the enforcement cascade began. The Handbook specifically provides that Magellan shall not take any punitive action against any provider who requests or supports an appeal (Exhibit B, p. 54). Plaintiff filed his appeal on May 27, 2025. Ten days later, on June 6, Tovar removed Plaintiff from the Provider Advisory Committee without notice or stated reason (Exhibit I). This sequence plausibly constitutes punitive action for exercising the appeal right the Handbook itself guarantees, making Magellan's departure from its own standards independently probative of retaliatory motive.

20. Defendants' justifications are undermined by: (a) full remediation unacknowledged; (b) Magellan's own credentialing records contradicting staffing grounds; (c) Tovar's admission that cited practices were commonplace; (d) the termination letter's reservation of "additional grounds"; and (e) the same-morning termination contradicting the process-driven framework and mandatory review timelines established under Amendment No. 1, §§ 2.7, 2.14, 2.27 (Exhibit E).

21. Taken together, these facts support a plausible inference of pretext at the pleading stage. Plaintiff completed remediation of all ten deficiency categories and submitted verified documentation before termination, yet Magellan neither acknowledged nor reviewed the submission. Magellan's own credentialing records reflected credentialed providers associated with WHR, contradicting the stated basis for termination. Tovar acknowledged

that the cited practices were commonplace among other network providers. The termination letter reserved "additional grounds for termination," suggesting the stated rationale was not the actual basis for the decision. And the same-day termination conflicted with the governing contract's continuity-of-care obligations and measured remediation requirements under Amendment No. 1, §§ 2.7, 2.14, 2.27 (Exhibit E). The cumulative weight of these contradictions plausibly undermines the Defendants' stated rationale and requires discovery to resolve.

22. Terminating a provider on the same morning full compliance documentation was submitted is inconsistent with the governing contract's process-driven decision-making structure, including mandatory timelines, utilization review procedures, continuity-of-care obligations, and measured remediation requirements. At the pleading stage, this departure from the contractual process supports the inference that the termination was pretextual rather than the product of legitimate regulatory judgment.

The Handbook further reinforces the protected nature of Plaintiff's communication. Magellan maintains a "provider complaint system for providers to dispute Magellan's policies, procedures, or any aspect of Magellan's administrative functions" (Exhibit B, p. 51). Plaintiff's March 27, 2025, communication raised concerns about selective enforcement of compliance standards, falling squarely within this definition. Rather than investigate and resolve the complaint within the mandatory 30 business days (Exhibit B, p. 52), Defendants escalated enforcement against the complainant. Magellan's own complaint system required investigation of the very grievance for which Defendants instead imposed termination.

**D.  Magellan Plausibly Qualifies as a State Actor Under 42 U.S.C. § 1983.**

23. A 1983 plaintiff must allege a constitutional violation proximately caused by conduct under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The Ninth Circuit

recognizes three alternative theories of state action: (1) the public function test; (2) the entwinement test; and (3) the symbiotic relationship test.

24. Like the private behavioral health contractor in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020), Magellan exercises exclusive state-delegated authority over behavioral health services with no alternative access point for providers or patients. In *Rawson*, the Ninth Circuit held that a private mental-health contractor performing state-delegated functions was subject to § 1983. The allegations here plausibly support entwinement to at least the same degree recognized in *Rawson*: Magellan administers the sole statewide Medicaid behavioral health network for 425,000 beneficiaries under a $1.216 billion state contract, conducts provider audits, medical necessity determinations, utilization review, and terminations, and operates under mandatory state-imposed timelines and oversight (Amendment No. 1, §§ 2.7, 2.27, 4.4, Exhibit E).

25. The State's entwinement is substantial. Amendment No. 1 designates Welsh as Magellan's sole Contractor Contact, bears his digital signature (Exhibit E, pp. 1, 10), requires two-business-day notification of key personnel changes with resumes (§ 4.4), and imposes mandatory timelines, reporting requirements, and conflict-free service obligations (§§ 2.7, 2.27, 39.1). The State formally reviewed and approved Welsh and Tovar before they exercised regulatory authority. *See Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295, 298 (2001).

26. The $1.216 billion contract, IDHW's joint authorship of the Handbook, and the State's approval of key personnel independently support a symbiotic relationship between Magellan and the State. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961) (state action where government and private entity are so intertwined that one cannot realistically be treated as acting separately from the other).

27. Magellan itself states that IDHW "partnered with Magellan Healthcare to serve as the state-wide administrator for the new Idaho Behavioral Health Plan" (Exhibit M, p. 4). The

Handbook further requires Magellan to submit a monthly report of all provider complaints to IDHW, including the nature of each complaint, resolutions, and timeframes (Exhibit B, p. 52), confirming ongoing, active state oversight of Magellan's provider relations and enforcement decisions.

28. Welsh and Tovar previously held senior IDHW roles overseeing the IBHP, then assumed positions administering the same program under Magellan. They now exercise state-delegated authority to audit and terminate providers while one manages a competing clinic. As individuals exercising authority delegated by the State (authority the State approved, funded, and oversaw), Welsh and Tovar acted under color of state law when they audited, deficiency-lettered, and terminated WHR. Their conduct is attributable to the State. *West v. Atkins*, 487 U.S. 42 (1988); *Rawson*, 975 F.3d at 748-49.

**E. Count Two: Procedural Due Process Survives Dismissal.**

29. The Fourteenth Amendment prohibits deprivation of liberty or property without due process. The FAC alleges both.

30. Liberty Interest. Defendants' false statement that WHR "voluntarily terminated" stigmatized Plaintiff and foreclosed future IBHP opportunities without notice or opportunity to respond. *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972); *Paul v. Davis*, 424 U.S. 693 (1976). Magellan's false statements were made directly to Plaintiff's patients (the very population whose access to care depended on WHR's participation in the network), constituting public disclosure in connection with the deprivation of Plaintiff's provider status.

31. Property Interest. The property interest here arises not from the Handbook alone but from the intersection of three independent sources: (a) the statewide regulatory structure granting Magellan exclusive market control over provider participation with no alternative pathway; (b) the IBHP Handbook Supplement's mandatory procedural safeguards using "will," "must," and "shall" (creating substantive limitations on Magellan's discretion to

terminate); and (c) the governing state contract imposing binding timelines, medical necessity standards, and continuity-of-care obligations that further constrain termination authority (Amendment No. 1, §§ 2.1, 2.7, 2.14, 2.27, Exhibit E). The Handbook uses "may be terminated" for substantive grounds, but imposes mandatory procedural conditions precedent. That mandatory language, reinforced by the regulatory monopoly and contractual constraints, creates the legitimate claim of entitlement required by *Roth*, 408 U.S. at 577. Unlike cases where participation remains discretionary and alternatives exist, here the regulatory structure forecloses all alternative access, transforming procedural safeguards into constitutionally protected entitlements.

32. The process was constitutionally deficient. Defendants bypassed every mandatory condition precedent: no advance notice, no corrective action period, no collaborative remediation, no investigation or resolution of Plaintiff's March 27, 2025, provider complaint within the mandatory thirty business days (Exhibit B, pp. 51-52), and the appeal was routed to the terminator himself. Termination occurred the same morning Plaintiff documented compliance. The appeal structure (routing review to the individual who signed the termination) denied Plaintiff access to a neutral decision-maker, rendering the appeal constitutionally inadequate, independent of all other procedural failures. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (due process requires a neutral arbiter). This structural conflict independently violates due process and further supports the inference of pretext at the pleading stage.

## F.  Count Three: Substantive Due Process Survives Dismissal.

33. Substantive due process guards against state action so arbitrary as to shock the conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Where the actor had time to deliberate, the deliberate indifference standard applies. *Id.* at 853.

34. The FAC alleges that officials with disqualifying personal conflicts used state-delegated regulatory authority to terminate a compliant provider for reasons unrelated to legitimate

objectives. Tovar managed a directly competing clinic (Exhibits D, H). Welsh faced personal legal exposure from Plaintiff's communication, naming him individually, and served as both terminator and sole appeal reviewer, raising substantial concerns regarding neutrality and legitimate regulatory administration.

35. The FAC plausibly supports the inference that Defendants' conduct was conscience-shocking under the totality of the circumstances: full remediation submitted and ignored; credentialing records contradicting the stated basis; Tovar's admission that cited practices were commonplace; the termination letter's reservation of "additional grounds"; and termination violating Magellan's own contractual continuity-of-care obligations (Amendment No. 1, §§ 2.1, 2.14, Exhibit E). This was not improvised overreach. The termination letter was prepared and issued the same morning remediation arrived (evidence that Defendants deliberated toward a predetermined outcome, knowing that outcome would destroy a compliant provider). Deliberate regulatory action by conflicted officials against a compliant provider, hours after documented compliance, supports the inference of arbitrary state-delegated action unrelated to legitimate regulatory objectives. The same-day termination plausibly conflicted with Magellan's own contractual obligations regarding continuity of care and coordinated behavioral-health administration, further supporting the inference of operational irrationality at the pleading stage.

Magellan's own Handbook declares that its quality investigation process is "designed... to support providers in improving service quality" (Exhibit B, p. 47). The same-morning termination of a provider who had just submitted full remediation is irreconcilable with this stated purpose, further supporting the inference of a predetermined outcome driven by improper motive rather than legitimate regulatory administration.

## G. Count Four: Equal Protection Survives Dismissal.

36. Under the class-of-one doctrine, a plaintiff states a claim by alleging intentional differential treatment without a rational basis. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

37. The Named Comparator. Tovar's own admission that WHR's cited practices were commonplace among network providers is the primary evidence of differential treatment (confirming from a defendant's own mouth that the enforcement standard applied to WHR was not being applied to the broader network). On May 6, 2025 (before termination), Plaintiff's staff asked in writing whether similar procedures had been initiated against Moonlight Mountain locations. No response was provided. Defendants' silence, followed by escalation, is itself probative of differential intent.

38. Moonlight Mountain Counseling operates under the same IBHP contract, offers the same intensive outpatient and partial hospitalization services, serves the same Medicaid population, and practices in the same North Idaho region. Unlike WHR, Moonlight Mountain received no unannounced audits, no deficiency letters, no termination, and no network removal. The plausible inference is that other similarly situated providers continued to receive the Handbook's procedural protection while WHR alone was subjected to enforcement bypassing those protections.

39. The Departure. Defendants abandoned the entire procedural framework for WHR alone: no advance notice, no corrective action period, no collaborative remediation, no substantive appeal, and same-morning termination despite compliance. The Handbook and governing contract impose binding, rule-bound obligations using mandatory language (Exhibit B; Amendment No. 1, §§ 2.7, 2.27, Exhibit E), not open-ended discretion.

40. Engquist Does Not Apply. Provider termination under the IBHP is a rule-bound regulatory function, not a discretionary employment decision. *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 602 (2008). The FAC independently alleges subjective ill will: temporal proximity (61 days), systematic procedural departures, Tovar's competing clinic (Exhibits D, H, W), and his continued PAC participation after removing Plaintiff. Either ground sustains the claim.

**H.  Count Five: Intentional Interference Survives.**

41. Idaho courts require a valid economic relationship, defendant's knowledge, intentional interference through wrongful means, and damages. *Cantwell v. City of Boise*, 146 Idaho 127, 134 (2008); *Highland Enters., Inc. v. Barker*, 133 Idaho 330, 336 (1999). The FAC alleges each element. The wrongful means for each ground is the use of regulatory authority held in a delegated public capacity to advance private competitive interests (an improper purpose Idaho tort law recognizes as a basis for liability).

42. First, False Statements. The termination letter directed patient inquiries exclusively to Magellan staff; Welsh authorized those staff to falsely state that WHR voluntarily terminated (FAC ¶¶ 47-48). The termination letter directed patient questions exclusively to Magellan staff, after which Magellan staff allegedly informed patients that WHR had voluntarily terminated. The wrongful means are the deliberate dissemination of false information to redirect patients and foreclose WHR's continued relationships.

43. Second, PAC Exclusion. Tovar directed the removal of a competitor from the advisory body while maintaining his own position (Exhibit I). The wrongful means is the use of regulatory authority to exclude a competitor from professional participation while retaining personal access to that same body.

44. Third, Use of Regulatory Authority While Managing a Competing Clinic. Idaho SOS records (Exhibit H) and Tovar's public profile (Exhibit D) confirm his management role in a competing clinic while conducting audits against a direct competitor. The wrongful means is the deployment of state-delegated enforcement authority for personal competitive advantage (a use of regulatory power that the governing contract's conflict-free provisions are expressly designed to prevent).

45. Fourth, Financial Disputes and Payment Administration Issues. Magellan's payment delays, lost contract, and eight months of limbo destabilized WHR before termination. The audit commenced immediately after WHR intensified payment demands. The wrongful means

are the manipulation of contractual payment and administrative processes to destabilize and ultimately eliminate a provider seeking enforcement of its own contract rights.

## I. Count Six: Conspiracy Survives Dismissal.

46. The FAC plausibly alleges the personal stake exception to the intra-corporate conspiracy doctrine.

47. Welsh's Personal Stakes. Plaintiff's pre-litigation communication is named Welsh individually. Welsh signed the termination and made himself the sole appeal reviewer, demonstrating personal rather than corporate motive. *Portman v. County of Santa Clara*, 995 F.2d 898, 909 (9th Cir. 1993). Welsh's trajectory (from evaluating the contract at IDHW, to signing it on behalf of Magellan, to terminating providers and serving as sole appeal reviewer) supports the inference that his actions were motivated by personal entrenchment and self-interest rather than neutral regulatory administration.

48. Tovar's Personal Stakes. Eliminating WHR removed a direct competitor. Tovar filed his competing clinic's annual report on June 2, 2025, and directed Plaintiff's PAC removal four days later (Exhibit I), active personal advancement of his competing business interest concurrent with WHR's elimination.

49. Amendment No. 1, § 2.14 governs specialty network providers and mandates that providers within the network "do not provide any other services to members in order to maintain conflict-free service provision" (Exhibit E). While § 2.14 does not by its literal terms prohibit a Magellan administrator from operating a competing clinic, its inclusion in the governing contract reflects a structural commitment to conflict-free administration of the network. Read alongside the allegations that Tovar simultaneously managed Treasure Valley Counseling and Wellness PLLC (a directly competing behavioral health clinic serving the same Medicaid population) while exercising network enforcement authority over WHR, § 2.14 contextually supports the plausibility that Tovar's enforcement actions

were influenced by personal competitive interest rather than legitimate administrative objectives.

50. Coordinated Conduct. On May 8, Welsh and Tovar both received identical notice of WHR's selective enforcement challenge. Neither responded. Both escalated. The sequence from misrepresented audit to internal escalation to same-morning termination to PAC removal, within 61 days of the pre-litigation communication, supports a plausible inference of agreement and coordinated action to eliminate competition.

**J. Qualified Immunity Does Not Bar This Action at the Pleading Stage.**

51. Qualified immunity is rarely resolvable at 12(b)(6). *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018). The FAC plausibly alleges that Welsh knowingly participated in conduct violating clearly established procedural protections.

52. The specific constitutional rights at issue were clearly established. A reasonable official in Welsh's position would know that (1) routing a provider appeal to the official who signed the termination letter violates the clearly established requirement of a neutral decision-maker under *Mathews v. Eldridge*, 424 U.S. 319 (1976); (2) terminating a provider while ignoring mandatory procedural safeguards outlined in the official's own governing Handbook violates clearly established due process principles; and (3) taking enforcement action against a provider who had just submitted a pre-litigation communication (a plainly protected petitioning act under *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002)) would be understood by any reasonable official to implicate First Amendment protections.

53. An arrangement in which the terminating official designates himself as the sole appeal reviewer is constitutionally impermissible on its face. No reasonable official could believe that the structure satisfies due process. Qualified immunity offers no protection where the violation is apparent from a clearly established doctrine.

**K. Independent State Law Claims Survive Even If State Action Is Not Found.**

54. Three independent state law grounds survive regardless of the state-action determination.

55. Tortious Interference. As alleged in Section IV.H, Tovar's competing clinic role independently supports an improper financial motive under Idaho tort law. *Highland Enters., Inc. v. Barker*, 133 Idaho 330, 336 (1999). A defendant who uses regulatory authority for personal competitive advantage acts with an improper purpose regardless of whether that authority derives from state law.

56. Defamation. Magellan staff's false statements to patients that WHR "voluntarily terminated" constitute defamation per se under Idaho law. The statements were false, made to third parties (patients), caused Plaintiff quantifiable reputational harm, and were authorized by Welsh following the termination. *Wiemer v. Rankin*, 117 Idaho 566, 570 (1990).

57. Breach of Implied Covenant of Good Faith and Fair Dealing. Magellan's conduct (losing the original contract, forcing re-execution, systematically delaying payments, and then terminating hours after full remediation was submitted) plausibly violated the implied covenant of good faith and fair dealing in its relationship with Plaintiff as WHR's operational principal. *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 626 (1989).

## L. Dismissal with Prejudice Is Not Warranted.

58. The Ninth Circuit requires a pro se plaintiff to receive at least one opportunity to amend before dismissal with prejudice. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc). Plaintiff respectfully requests leave to amend if the Court identifies any deficiency.

## V. CONCLUSION

59. The FAC plausibly alleges three concrete personal injuries: retaliatory destruction of Plaintiff's livelihood, removal by name from the PAC by a direct competitor, and false statements to patients.

60. Protected petitioning activity was followed within sixty-one days by enforcement against a previously compliant provider. Same-morning termination despite full remediation,

structural denial of neutral review, and Defendants' own contradictory records support the plausible inference of retaliation that Rule 12(b)(6) requires this Court to accept as true.

61. Discovery, not dismissal, is the proper vehicle to test motive, intent, and state entwinement.

62. Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety. In the alternative, should the Court identify any deficiency, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a) and Ninth Circuit authority requiring such an opportunity for pro se plaintiffs. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).

Respectfully submitted,

DATED: May 16, 2026

/s/ Elhadi Benkirane

Elhadi Benkirane
7506 Baerss Rd,
Riverside, California 92507
Telephone: (562) 391-1442
Benkirane.hadi@gmail.com
Plaintiff, Pro Se