Elhadi Benkirane
Plaintiff, Pro Se
7506 Baerss Rd
Riverside, California 92507
Telephone: (562) 391-1442
Benkirane.hadi@gmail.com

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

ELHADI BENKIRANE,

    Plaintiff,

v.

MAGELLAN HEALTHCARE, INC.;
DAVID WELSH; DAVID TOVAR;
andDOES 1 through 10,

    Defendants.

Case No. 2:25-cv-00314-DCN

**EXHIBIT A**

**SECOND AMENDED COMPLAINT
JURY TRIAL DEMANDED**

Hon. David C. Nye
United States District Judge

## I. NATURE OF THE ACTION

1. This is a civil rights action brought by Elhadi Benkirane as an individual. Defendants targeted Plaintiff personally with a coordinated campaign of retaliation for his protected speech, and used the WHR IOP LLC provider agreement as the mechanism to destroy his career, eliminate his income, and exclude him from professional participation. Plaintiff brings this action to vindicate his personal constitutional rights under 42 U.S.C. Section 1983 and to recover for state law torts committed against him personally. Plaintiff does not assert any claim belonging to WHR IOP LLC or any other corporate entity. Every claim in this Complaint arises from injuries suffered by Plaintiff in his individual capacity.

2. Plaintiff alleges that Defendants retaliated against him personally for exercising his First Amendment right to petition the government and to engage in protected pre-litigation speech.

Within 61 days of Plaintiff's protected communication, Defendants initiated and completed an enforcement cascade that destroyed Plaintiff's career, eliminated his income, damaged his professional reputation, and excluded him from professional participation. Each step in that cascade was directed at Plaintiff individually. Defendants used WHR's provider agreement as the vehicle, but Elhadi Benkirane was the target.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. Section 1331 (federal question) because Plaintiff's claims arise under 42 U.S.C. Section 1983 and the First and Fourteenth Amendments to the United States Constitution.

4. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. Section 1367 because those claims arise from the same nucleus of operative facts as Plaintiff's federal claims.

5. Venue is proper in this District under 28 U.S.C. Section 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Idaho.

## III. PARTIES

### A. Plaintiff

6. Plaintiff Elhadi Benkirane is a natural person and resident of the State of California. From the founding of WHR IOP LLC until September 1, 2025, Plaintiff served as Executive Director of WHR IOP LLC, a behavioral health provider that participated in the Idaho Behavioral Health Plan (IBHP) network administered by Defendant Magellan Healthcare, Inc.

7. Plaintiff's annual compensation as Executive Director exceeded $200,000. Plaintiff's employment was terminated by WHR on September 1, 2025, expressly because of the loss of the Magellan provider agreement caused by Defendants' retaliatory conduct directed at Plaintiff personally.

8. Plaintiff brings this action solely in his individual capacity. He does not assert any claim on behalf of WHR IOP LLC. His injuries are personal: loss of employment, loss of income, destruction of professional reputation, and exclusion from professional participation.

**B. Defendant Magellan Healthcare, Inc.**

9. Defendant Magellan Healthcare, Inc. ("Magellan") is a corporation organized under the laws of the State of Arizona, with its principal place of business in Phoenix, Arizona. Magellan is a wholly owned subsidiary of Centene Corporation.

10. Magellan is the sole managed care organization administering the Idaho Behavioral Health Plan under a contract with the Idaho Department of Health and Welfare ("IDHW") valued at approximately $1.216 billion. Under this contract, Magellan exercises exclusive authority over provider network participation, credentialing, compliance enforcement, and termination for all behavioral health providers serving Idaho Medicaid beneficiaries.

11. On February 13, 2026, Centene Corporation announced a definitive agreement to divest Magellan Health Services Incorporated to Madison Health Group ("MHG"), a newly formed entity. On March 19, 2026, the California Office of Health Care Affordability commenced regulatory review of this transaction, requiring a 90-day advance notice before the transaction can close. The regulatory notice was filed by Crowell and Moring LLP, the same firm representing Defendants in this action. This filing acknowledges that Magellan's ownership structure is subject to state regulatory review and approval.

**C. Defendant David Welsh**

12. Defendant David Welsh is a natural person who, at all relevant times, served as Magellan's designated Contractor Contact with the State of Idaho under the IBHP contract.

13. Prior to joining Magellan, Welsh served as a senior official at the Idaho Department of Health and Welfare, where he evaluated competing bids for the IBHP contract. Welsh gave Magellan's bid the second-highest score. Welsh subsequently left IDHW and assumed the role

of Magellan's sole Contractor Contact with the State, personally executing the $1.216 billion IBHP contract. The State formally reviewed and approved Welsh before he exercised regulatory authority on Magellan's behalf.

14. Welsh is sued in his individual capacity. Welsh personally signed the May 27, 2025 termination letter addressed to "Elhadi Benkirane, OWNER." Welsh directed the appeal exclusively to himself, making himself the sole appeal reviewer despite having been personally named in Plaintiff's March 27, 2025 pre-litigation communication. Welsh authorized Magellan staff to make false statements to Plaintiff's patients that WHR had "voluntarily terminated." Welsh faced personal legal exposure from Plaintiff's pre-litigation communication, giving him personal motivation to target Plaintiff.

**D. Defendant David Tovar**

15. Defendant David Tovar is a natural person who, at all relevant times, served as Magellan's Network Director for the IBHP.

16. Tovar is the co-owner and manager of Treasure Valley Counseling and Wellness PLLC, a behavioral health clinic established in July 2023 that serves the same Medicaid patient population in the same North Idaho service area as WHR. Tovar's clinic directly competes with WHR for IBHP patients. The Idaho Secretary of State records confirm Tovar is listed as Manager of Treasure Valley Counseling and Wellness PLLC. The National Provider Identifier public registry confirms Lisa Marie Tovar, LCSW, as the registered owner (NPI 1649959495). Tovar's public professional profile identifies him as Co-Owner.

17. Tovar is sued in his individual capacity. Tovar conducted the May 1, 2025, site visit (characterized as "informal" but escalated into an extensive audit). Tovar conducted the May 12, 2025, follow-up site visit. Tovar signed the May 19, 2025, deficiency letter identifying ten deficiency categories. Tovar directed Plaintiff's removal by name from the Provider Advisory Committee on June 6, 2025. Tovar filed his competing clinic's annual report on June 2, 2025,

four days before removing Plaintiff from the PAC. Tovar remained on the PAC after removing Plaintiff. Tovar chaired the May 22, 2025, PAC meeting, where Plaintiff was marked absent without prior notice.

18. IBHP Contract Amendment No. 1, Section 39.1 requires conflict-free service provision. The Handbook requires appeal independence, prohibiting appeal decisions by staff involved in prior review. Tovar was involved in the enforcement action and remained in a position of authority over Plaintiff's professional participation, in direct violation of these requirements.

## IV. STANDING: PLAINTIFF'S PERSONAL INJURIES

19. This section addresses the standing issue identified in this Court's March 27, 2026 Order (Dkt. 31). The central standing question is whether Plaintiff's injuries are personal and direct, or merely derivative of WHR's corporate injuries. Plaintiff respectfully submits that the answer is clear: Defendants targeted Plaintiff personally for retaliation, and they used WHR's provider agreement as the mechanism to carry out that retaliation. The injuries Plaintiff suffered are his own, not WHR's.

20. Plaintiff lacks the authority to cause WHR IOP LLC to appear in this action and cannot compel WHR to participate. WHR terminated Plaintiff's employment on September 1, 2025. Since that date, Plaintiff has had no contact with WHR, no authority over WHR, and no ability to compel WHR's participation in this litigation. WHR is a separate legal entity that fired Plaintiff. Plaintiff does not speak for WHR and cannot bind WHR to any litigation position.

21. Plaintiff's injuries are not derivative of WHR's corporate injuries. They are direct personal injuries caused by Defendants' retaliatory conduct directed at Plaintiff individually. The evidence that Defendants targeted Plaintiff personally, not merely WHR as a corporation, includes the following:

22. **Loss of Employment:** Defendants' retaliatory enforcement cascade was the mechanism by which they stripped Plaintiff of his livelihood. Plaintiff lost his position as Executive

Director, with annual compensation exceeding $200,000, as a direct result of Defendants' retaliatory termination of the provider agreement. Defendants knew that terminating WHR's provider agreement would result in Plaintiff's termination. WHR terminated Plaintiff expressly because of the loss of the Magellan contract caused by Defendants' retaliatory conduct.

**23. PAC Removal By Name:** On June 6, 2025, Plaintiff was removed by name from the Provider Advisory Committee. The removal email specifically identified "Elhadi Benkirane" for exclusion. This was not an action against WHR as a corporate entity. No prior notice was given. No reason was stated. No contractual basis tied to WHR's network status was cited. Tovar was copied on the removal email and remained on the PAC despite managing a competing clinic. This action targeted Plaintiff personally and could only have been directed at him as an individual.

**24. False Statements About Plaintiff Personally:** Welsh authorized Magellan staff to falsely tell Plaintiff's patients that WHR had "voluntarily terminated." The termination letter directed patient inquiries exclusively to Magellan staff. These false statements were not about WHR as a corporate entity. They were about Plaintiff's professional conduct and damaged Plaintiff's personal professional reputation in the community he served.

**25. Termination Letter Addressed to Plaintiff Personally:** The May 27, 2025 termination letter was addressed to "Elhadi Benkirane, OWNER," not to WHR IOP LLC as a corporate entity. Defendants themselves treated Plaintiff as the individual target of their conduct. This fact, among the others described herein, supports the inference that WHR's contract was the mechanism Defendants used to retaliate against Plaintiff personally.

**26. Continuing Barriers to Employment:** Since September 1, 2025, Plaintiff has applied for more than 200 positions in the behavioral health industry, including positions as Executive Director, Behavioral Health Administrator, Compliance, and Managed Care, including positions substantially below his prior compensation level and below his prior executive rank.

Despite Plaintiff's extensive experience in behavioral health administration, Plaintiff has not received a single interview. Prior to Defendants' actions, Plaintiff had worked in behavioral health administration for years and had never been required to disclose any Medicaid network termination, adverse participation action, or comparable credentialing event. Every application required Plaintiff to disclose whether he had previously been removed from a Medicaid network, had a provider agreement terminated, or been subject to adverse participation actions. See Exhibit B (representative examples of industry-standard disclosure requirements for healthcare employment). Plaintiff truthfully disclosed Defendants' actions in each application. Plaintiff's applications have not advanced after these disclosures. See Exhibit C (federal OIG documentation of the career consequences of exclusion and adverse Medicaid/Medicare actions). Plaintiff has retained records of these applications and rejections and can produce them in discovery. See also Declaration of Elhadi Benkirane (sworn statement regarding 200+ applications and zero interviews). This injury is personal to Plaintiff, is continuing, and exists independently of any injury suffered by WHR IOP LLC.

27. The distinction between Plaintiff's claims and impermissible derivative claims is clear. The Ninth Circuit has held that a plaintiff who suffers direct personal injuries as a result of conduct directed at him personally has standing regardless of whether a corporate entity sustained related harm. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1318 (9th Cir. 1989) (distinguishing derivative shareholder claims from direct personal injuries that are independently actionable). An employee who is personally targeted for retaliation, personally named for exclusion, personally defamed to his patients, and personally deprived of his livelihood asserts a direct claim. Plaintiff's constitutional rights were violated. Those rights belong to him, not to WHR. The conduct Defendants directed at Plaintiff personally creates standing regardless of WHR's independent corporate injuries.

28. Plaintiff's damages are calculated exclusively in personal terms:

29. Lost salary: in excess of $200,000 annually from September 1, 2025, through the present and continuing

30. Lost future earning capacity as a behavioral health executive

31. Reputational harm from false statements to patients and the professional community

32. Loss of professional participation and networking through PAC exclusion

33. Emotional distress, humiliation, and financial devastation

## V. FACTUAL ALLEGATIONS

### A. Background: The Idaho Behavioral Health Plan

34. The Idaho Behavioral Health Plan is Idaho's Medicaid managed care program for behavioral health services. IDHW contracts with a single managed care organization to administer the entire program. Magellan is the sole MCO and has been since the program's inception.

35. Under the IBHP contract, Magellan exercises exclusive authority to determine which providers may participate in the network, what standards they must meet, and whether they may continue to serve Medicaid beneficiaries. No behavioral health provider can serve Idaho Medicaid patients without Magellan's approval. Magellan's decisions are final and unreviewable by any neutral body.

36. The IBHP contract is valued at approximately $1.216 billion. Magellan receives state funds, exercises state-delegated authority, and performs a function that would otherwise be performed by IDHW itself. Critically, Magellan's authority over network participation gave Welsh and Tovar the power to use that authority as the instrument to target Plaintiff personally. **B. Plaintiff's Protected Activity**

37. On March 27, 2025, Plaintiff sent a pre-litigation communication to David Welsh and David Tovar in their individual capacities. The communication asserted anticipated personal

litigation against each of them individually and raised concerns regarding selective enforcement of compliance standards against WHR.

38. Plaintiff's communication constituted protected activity under the First Amendment's Petition Clause. Pre-litigation communications asserting anticipated legal action are core First Amendment activity. *BE&K Construction Co. v. NLRB*, 536 U.S. 516, 524-25 (2002).

39. Plaintiff's communication also constituted protected activity under Magellan's own Provider Handbook, which maintains a "provider complaint system for providers to dispute Magellan's policies, procedures, or any aspect of Magellan's administrative functions." The Handbook requires Magellan to investigate and resolve complaints within 30 business days and prohibits punitive action against any provider who files a complaint.

40. Prior to March 27, 2025, WHR was in good standing with Magellan. On February 21, 2025, Magellan confirmed in writing that WHR had an active contract with no compliance issues. No audits had been conducted. No deficiency letters had been issued. No enforcement action of any kind had been initiated against WHR or against Plaintiff.

**C. The Retaliatory Enforcement Cascade: Defendants Used WHR's Provider Agreement as the Mechanism to Target Plaintiff Personally**

41. Within 61 days of Plaintiff's March 27, 2025 protected communication, Defendants initiated and completed an enforcement cascade directed at Plaintiff personally. Defendants used WHR's provider agreement as the vehicle for this retaliation. Each step in the following sequence was an act directed at Plaintiff:

42. May 1, 2025 (35 days after protected communication): Tovar conducted a site visit at WHR. The visit was characterized as "informal" but escalated into an extensive compliance audit targeting Plaintiff's operations.

43. May 6, 2025: WHR staff member Marley asked in writing whether similar compliance procedures had been initiated against Moonlight Mountain locations. Magellan never answered this inquiry, confirming that the enforcement was directed exclusively at Plaintiff's workplace. 44. May 8, 2025: Welsh and Tovar both received notice of the selective enforcement challenge. Neither responded. Both escalated enforcement against Plaintiff.

45. May 12, 2025: Tovar conducted a second site visit at WHR.

46. May 19, 2025 (53 days after protected communication): Tovar signed a deficiency letter identifying ten deficiency categories. This letter was the escalation mechanism through which Defendants prepared to terminate Plaintiff's livelihood.

47. May 22, 2025: PAC meeting. Plaintiff was marked absent without prior notice of any issue with his participation. Tovar chaired the meeting.

48. May 27, 2025, 10:12 a.m. (61 days after protected communication): Plaintiff submitted comprehensive remediation addressing all ten deficiency categories and a formal appeal letter. 49. May 27, 2025 (same day): Welsh issued the termination letter. The letter was addressed to "Elhadi Benkirane, OWNER." The termination was issued the same morning Plaintiff submitted full remediation, demonstrating that the decision to terminate had been made before the remediation deadline expired. Welsh signed the letter and directed it at Plaintiff personally, not at WHR as a corporate entity.

50. June 2, 2025: Tovar filed his competing clinic's annual report with the Idaho Secretary of State.

51. June 6, 2025 (four days after filing annual report): Tovar directed Plaintiff's removal by name from the Provider Advisory Committee. The removal came ten days after Plaintiff filed his appeal. The Handbook explicitly prohibits punitive action against providers who appeal. This removal was directed at Plaintiff by name and was a direct act of personal retaliation.

52. The before-and-after contrast is stark. Before March 27, 2025: no audits, no enforcement, no compliance concerns, good standing confirmed in writing. After March 27, 2025: two site visits, a deficiency letter, same-morning termination despite full remediation, PAC removal by name, and false statements to Plaintiff's patients. This pattern is the hallmark of retaliation directed at an individual. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) (timing and sequence of events can establish retaliatory motive).

**D. The Appeal Was a Sham**

53. The May 27, 2025, termination letter directed Plaintiff's appeal exclusively to David Welsh, the same individual who signed the termination letter and who had been personally named in Plaintiff's March 27, 2025, pre-litigation communication. Routing the appeal to Welsh eliminated any possibility of neutral review and ensured that Plaintiff's challenge would be decided by the very person who had reason to retaliate against him.

54. Plaintiff submitted his appeal on May 27, 2025. Magellan never responded. On July 7, 2025, Plaintiff's staff requested an update on the pending appeal and reiterated the selective enforcement concern. Magellan did not respond. On August 25, 2025, Plaintiff emailed Magellan requesting an immediate decision on the appeal. Nearly three months after termination, Magellan still had not responded. The appeal was never adjudicated.

55. The Handbook requires appeal independence, prohibiting appeal decisions by staff involved in prior review. Welsh was involved in the termination decision and was the sole appeal reviewer, in direct violation of this requirement.

**E. Moonlight Mountain: The Similarly Situated Comparator**

56. Upon information and belief, Moonlight Mountain Counseling is a behavioral health provider that operates under the same IBHP contract, offers the same or similar intensive outpatient and partial hospitalization services, serves the same Medicaid population, and practices in the same North Idaho region as WHR. Plaintiff anticipates that discovery will

confirm the full extent of the similarities between Moonlight Mountain and WHR, including compliance history and operational structure.

57. Upon information and belief, Moonlight Mountain received no unannounced audits, no deficiency letters, no termination, and no network removal during the same time period. Plaintiff anticipates that discovery will establish the full record of enforcement (or non- enforcement) directed at Moonlight Mountain during the relevant period. Moonlight Mountain was not subjected to any enforcement action comparable to what was directed at WHR and at Plaintiff personally.

58. Tovar acknowledged during the May 1, 2025 site visit that WHR's cited practices were commonplace among network providers. Despite this acknowledgment, enforcement was directed exclusively at WHR, the provider whose Executive Director had filed a complaint and threatened litigation against Welsh and Tovar personally.

59. The selective enforcement of compliance standards against WHR, while leaving Moonlight Mountain and other similarly situated providers untouched, supports an inference that the enforcement was pretextual and retaliatory rather than based on legitimate compliance concerns. *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1123 (9th Cir. 2022) (requiring identification of similarly situated comparators for equal protection claims).

**F. Payment Disputes and Retaliatory Motive**

60. Prior to the enforcement cascade, WHR had documented outstanding payment claims of $146,831.02 against Magellan. WHR's claims were being denied as out-of-network despite a signed provider agreement. WHR's billing company quit due to non-payment by Magellan.

61. On March 26, 2025, WHR sent a demand letter for the $146,831.02 outstanding balance. The following day, March 27, 2025, Plaintiff sent his pre-litigation communication naming Welsh and Tovar individually. The compliance audit commenced immediately after WHR intensified payment demands and Plaintiff threatened personal litigation. This sequence further

supports the inference that the enforcement cascade was directed at Plaintiff personally in retaliation for his protected speech.

## VI. STATE ACTION

62. Defendants are state actors for purposes of 42 U.S.C. Section 1983. The Supreme Court held in *West v. Atkins*, 487 U.S. 42, 56 (1988), that a private entity performing a function traditionally reserved to the state acts under color of state law. The Ninth Circuit applied that principle in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020), recognizing that a private contractor performing state-delegated functions is a state actor. Whether an entity is a state actor is a fact-intensive inquiry that is not appropriately resolved at the pleading stage on a Rule 12(b)(6) motion. Magellan exercises powers traditionally and exclusively reserved to the state, satisfying multiple tests for state action.

### A. Public Function

63. Magellan performs a function that is traditionally and exclusively the province of the state: administering the Medicaid behavioral health program for the entire State of Idaho. Magellan is the sole entity authorized to perform this function. No private market alternative exists. Providers cannot serve Medicaid patients without Magellan's approval. *West v. Atkins*, 487 U.S. 42, 49-56 (1988) (private physician under contract with state performing medical services traditionally provided by the state acts under color of state law; the inquiry focuses on the nature of the function performed, not the formal status of the entity). Magellan's exclusive authority over Idaho Medicaid network participation is precisely the type of state-delegated regulatory function *West v. Atkins* identifies as state action.

### B. State Compulsion and Entwinement

64. The State of Idaho exercises pervasive control over Magellan's operations through the IBHP contract. The State sets the standards Magellan enforces, approves Magellan's personnel (including Welsh), reviews Magellan's decisions, and funds Magellan's operations entirely

through public funds. The State reviewed and approved Welsh before he exercised regulatory authority. The State requires advance regulatory approval before Magellan's ownership can change hands.

65. The requirement for state regulatory approval of ownership changes demonstrates substantial state entwinement with Magellan's operations. On March 19, 2026, the California Office of Health Care Affordability commenced review of the Centene/Madison Health Group transaction, requiring a 90-day advance notice before the transaction can close. The regulatory notice was filed by Crowell and Moring LLP, the same firm that represents Defendants in this litigation. This filing acknowledges that Magellan's ownership structure is subject to state regulatory review and approval.

**C. Symbiotic Relationship**

66. Magellan and the State of Idaho are in a symbiotic relationship. The State depends on Magellan to fulfill its Medicaid obligations. Magellan depends on the State for its entire revenue stream ($1.216 billion). The State has delegated its regulatory authority to Magellan and relies on Magellan to exercise that authority on its behalf. The relationship is not merely contractual; it is interdependent and mutually reinforcing.

67. The Ninth Circuit has recognized that private entities administering government programs can be state actors when the government delegates traditionally public functions and maintains pervasive involvement. *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 754-55 (9th Cir. 2020) (private entity performing state-delegated function was state actor; court emphasized the pervasiveness of state control and the state's heavy reliance on the private entity to perform government functions). The court in *Rawson* specifically noted that the state-action inquiry is fact-intensive and depends on the totality of the relationship between the state and the private entity. That totality inquiry is inappropriate for resolution under Rule 12(b)(6), where the Court

must accept all well-pleaded factual allegations as true. Plaintiff has pleaded sufficient facts to raise

a plausible state-action claim that entitles him to proceed to discovery on this issue.

## VII. CLAIMS FOR RELIEF

## COUNT ONE: FIRST AMENDMENT RETALIATION (42 U.S.C. Section 1983)

(Against All Defendants)

68. Plaintiff incorporates all preceding paragraphs by reference.

69. Plaintiff engaged in constitutionally protected activity on March 27, 2025, when he sent a pre-litigation communication asserting anticipated legal action and raising concerns about selective enforcement. The communication was directed personally at Welsh and Tovar as individuals.

70. Defendants used WHR's provider agreement as the mechanism to subject Plaintiff to adverse action: termination of the provider agreement (the vehicle through which Defendants destroyed Plaintiff's employment), removal from the PAC by Plaintiff's name, false statements to Plaintiff's patients, and routing the appeal to the same individual who retaliated against Plaintiff.

71. Plaintiff's protected activity was a substantial or motivating factor in Defendants' adverse actions. This is established by: (a) temporal proximity of 61 days between protected activity and termination; (b) the before-and-after contrast (no enforcement before, immediate escalation after); (c) same-morning termination despite full remediation; (d) Tovar's conflict of interest (managing a competing clinic); (e) Welsh's personal legal exposure from being named in the pre-litigation communication; (f) selective enforcement against WHR while leaving similarly situated providers untouched; and (g) the sham appeal routed to the retaliator himself.

72. Defendants' stated justification (compliance deficiencies) is pretextual. Plaintiff submitted full remediation of all ten deficiency categories on the morning of May 27, 2025. The termination letter was issued the same morning, demonstrating the decision was made before

the remediation was reviewed. Tovar acknowledged that WHR's cited practices were commonplace among network providers.

## COUNT TWO: PROCEDURAL DUE PROCESS (42 U.S.C. Section 1983)

### (Against All Defendants)

73. Plaintiff incorporates all preceding paragraphs by reference.

74. Plaintiff had a protected liberty interest in his professional reputation and his ability to pursue employment in his chosen field. Defendants' false statements to patients that WHR had "voluntarily terminated" stigmatized Plaintiff in connection with the deprivation of his provider status and employment, satisfying the stigma-plus test. *Paul v. Davis*, 424 U.S. 693 (1976); *Ulrich v. City and County of San Francisco*, 308 F.3d 968 (9th Cir. 2002).

75. Defendants deprived Plaintiff of this interest without adequate process. The termination was issued the same morning remediation was submitted, before it could be reviewed. The appeal was routed to the retaliator. The appeal was never adjudicated despite three months of requests. No neutral decision-maker was ever involved.

## COUNT THREE: SUBSTANTIVE DUE PROCESS (42 U.S.C. Section 1983)

### (Against All Defendants)

76. Plaintiff incorporates all preceding paragraphs by reference.

77. Defendants' conduct shocks the conscience. Tovar audited and then used his regulatory authority to target a competitor while managing a directly competing clinic. Welsh served as both terminator and sole appeal reviewer after being personally named in Plaintiff's pre- litigation communication. The termination was issued the same morning full remediation was submitted. The appeal was never adjudicated. These actions, taken together, demonstrate deliberate indifference to Plaintiff's constitutional rights and an abuse of government-delegated power for personal and competitive advantage.

## COUNT FOUR: EQUAL PROTECTION, CLASS OF ONE (42 U.S.C. Section 1983)

(Against All Defendants)

78. Plaintiff incorporates all preceding paragraphs by reference.

79. Plaintiff was treated differently from Moonlight Mountain Counseling, a provider that, upon information and belief, operates under the same IBHP contract, offers the same or similar services, serves the same population, and practices in the same region. Upon information and belief, Moonlight Mountain received no audits, no deficiency letters, no termination, and no network removal during the same period. Discovery is needed to confirm the full extent of the similarly situated comparison.

80. There is no rational basis for the differential treatment. Tovar acknowledged that WHR's cited practices were commonplace among network providers. The only distinguishing factor between WHR and Moonlight Mountain is that WHR's Executive Director, Plaintiff, filed a complaint and threatened litigation naming Welsh and Tovar personally.

81. Defendants intentionally treated Plaintiff differently from similarly situated providers. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

## COUNT FIVE: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

(Against Defendants Welsh and Tovar)

82. Plaintiff incorporates all preceding paragraphs by reference.

83. Plaintiff had a valid economic relationship with WHR as its Executive Director, with annual compensation exceeding $200,000. Defendants knew of this relationship and targeted it as the instrument through which they would harm Plaintiff personally.

84. Defendants intentionally interfered with Plaintiff's economic relationship through retaliatory conduct directed at Plaintiff personally. The termination letter was addressed to Plaintiff by name. The PAC removal targeted Plaintiff by name. The false statements were made about Plaintiff to his patients.

85. Defendants' interference was independently wrongful: it was motivated by retaliation for protected speech, by Tovar's competitive interest in eliminating a rival, and by Welsh's desire to silence a complainant who had named him personally.

86. As a direct and proximate result of Defendants' interference, Plaintiff lost his employment, his income, his professional standing, and his career. Plaintiff has suffered damages in excess of $200,000 in lost salary alone, plus lost future earning capacity, reputational harm, and emotional distress.

## COUNT SIX: CIVIL CONSPIRACY

(Against All Defendants)

87. Plaintiff incorporates all preceding paragraphs by reference.

88. Defendants Welsh and Tovar, acting in concert with Magellan, agreed to retaliate against Plaintiff for his protected communication. The agreement is evidenced by: (a) the coordinated escalation of enforcement after March 27, 2025; (b) Welsh and Tovar both receiving notice of the selective enforcement challenge on May 8, 2025, and both escalating rather than responding; (c) the coordinated sequence of site visits, deficiency letter, termination, and PAC removal by name; and (d) Welsh routing the appeal to himself while Tovar removed Plaintiff from the PAC.

89. In furtherance of this conspiracy, Defendants committed the overt acts described in Section V above, using WHR's provider agreement as the mechanism to carry out their retaliatory campaign against Plaintiff personally.

## VIII. PRAYER FOR RELIEF

90. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

91. A declaration that Defendants violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution;

92. Compensatory damages in an amount to be proven at trial, including but not limited to:

93. Lost salary in excess of $200,000 annually from September 1, 2025 through the date of judgment

94. Lost future earning capacity

95. Reputational harm

96. Emotional distress, humiliation, and mental anguish

97. Loss of professional participation and networking opportunities

98. Punitive damages against Defendants Welsh and Tovar in their individual capacities;

99. Attorneys' fees and costs under 42 U.S.C. Section 1988 (to the extent Plaintiff retains counsel);

100. Pre-judgment and post-judgment interest;

101. Such other and further relief as this Court deems just and equitable.

## IX. JURY DEMAND

102. Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

DATED: _____June 2nd_____, 2026

*Benkirane*

/s/ Elhadi Benkirane
Elhadi Benkirane
Plaintiff, Pro Se
7506 Baerss Rd
Riverside, California 92507
Telephone: (562) 391-1442
Benkirane.hadi@gmail.com

**EXHIBIT B**

**INDUSTRY-STANDARD HEALTHCARE EMPLOYMENT AND CREDENTIALING DISCLOSURE REQUIREMENTS**

The following pages are representative examples demonstrating that behavioral health employers, managed care organizations, and Medicaid-participating providers routinely require applicants and credentialing candidates to disclose prior adverse actions, network terminations, and Medicaid/Medicare exclusion history. These materials are offered to establish the continuing nature of Plaintiff's injury as alleged in the Second Amended Complaint, Section IV.

Standard credentialing applications across the behavioral health industry include questions of the following type:

"Has your professional employment or membership in a professional organization ever been subject to disciplinary proceedings, denied, limited, restricted, reduced, suspended, revoked, not renewed, or voluntarily relinquished during or under threat of termination for any reason?"

"Have you ever been the subject of current, former, or pending complaints; the subject of a current or pending investigation or formal review; or placed on probation, suspended, reprimanded, or received any other type of disciplinary or corrective action?"

"Have you ever been involuntarily terminated from a position of employment? If so, please explain."

Healthcare employers that participate in federal healthcare programs are required by law to screen all prospective employees and contractors against the U.S. Department of Health and Human Services Office of Inspector General List of Excluded Individuals and Entities (LEIE) and the System for Award Management (SAM) prior to hire. Employers face civil monetary penalties of $10,000 per claim for employing or contracting with excluded individuals. As a result, any applicant who discloses prior adverse Medicaid/Medicare actions is subject to disqualification across all positions at Medicaid/Medicare-participating organizations.

Source documents are reproduced on the following pages.

Case 2:25-cv-00314-DCN   Document 46-1   Filed 06/02/26   Page 22 of 39



| Topics | Navigation |
| --- | --- |

ADVERTISEMENT

# The incessant hounding of doctors: A look at the lengthy professional disclosures required of physicians

ARTHUR LAZARUS, MD, MBA | PHYSICIAN | JANUARY 12, 2023



Can you absolutely and unequivocally answer "no" to all of the following questions:

Has your license to practice in any jurisdiction ever been limited, restricted, reduced, suspended, voluntarily surrendered, revoked, denied, or not renewed?

ADVERTISEMENT

Have you ever been reprimanded by a state licensing agency, or are any of these actions pending with respect to your license; are you under investigation by any licensing or regulatory agency?

6/1/26, 9:53 PM
Case 2:25-cv-00314-DCN    Document 46-1    Filed 06/02/26    Page 23 of 39
The incessant hounding of doctors: A look at the lengthy professional disclosures required of physicians

Has your Drug Enforcement Agency registration or other controlled substance authorization ever been limited, restricted, reduced, suspended, revoked, denied, or not renewed, or have you voluntarily surrendered or limited your registration during or under threat of investigation or are any such actions pending?

Have you ever been sanctioned or suspended by Medicare or Medicaid?

Have you ever been reported to the National Practitioner Data Bank?

Have you ever been convicted of a felony or misdemeanor, or are you under investigation with respect to such conduct?

Has a professional liability claim ever been assessed against you, or are there any professional liability cases pending against you?

Has any liability insurance carrier canceled, refused coverage, or rated up because of unusual risk, or have any procedures been excluded from your coverage?

Do you currently have, or have you ever been treated for, any medical, chemical dependency, or psychiatric conditions that might adversely affect your ability to practice medicine or surgery or perform the essential function of your position?

Have your hospital or clinic privileges ever been limited, restricted, reduced, suspended, revoked, denied, or not renewed, or have you voluntarily surrendered or limited your privileges during or under the threat of an investigation, or are any such actions pending?
Have you voluntarily or involuntarily withdrawn or been suspended from any professional organization or society; or internship, residency, or fellowship training program?

Has there been any incident(s) in which you have involuntarily or voluntarily withdrawn your application for appointment, clinical privileges, or reappointment before a decision was made by a professional organization or society; or hospital or health care facility's governing board?

If you can truthfully answer "no" to all these questions, then you are probably in the minority, according to physician advocate, advisor, and author Pamela Wible, MD. She says doctors are trained to "lie to avoid punishment and to preserve their job, identity, ego, status, and money."

It seems that various organizations want carte blanche to review our curriculum vitae. They want to probe our background like we're an open book. Mandatory professional disclosures haunt us throughout our careers. They appear on applications of all sorts for medical licenses, membership in professional organizations and societies, and privileges in hospitals and clinics.

It's okay and perhaps necessary in some instances for entities to have access to our professional lives, but our entire career? The open-ended nature of these questions really irks me. "Have you ever …?" Yes, once I farted so hard against the hardwood floor in gym class that the sound resonated throughout the gymnasium. My astonished gym teacher took it in stride as the class erupted into laughter. Why can't licensing and professional bodies cut us some slack like my gym teacher?

6/1/26, 9:53 PM
Case 2:25-cv-00314-DCN   Document 46-1   Filed 06/02/26   Page 24 of 39
The incessant hounding of doctors: A look at the lengthy professional disclosures required of physicians

against physicians, and approximately half (3.402) were serious enough to warrant discipline: reprimands, fines, probation, CME requirements, licenses surrendered or revoked, and other conditions that were imposed.

That number may not seem high given over 1 million licensed physicians in the U.S. What is concerning, however, is the following statement from the FSMB on their website: "In an age of rapidly developing technology, state medical boards have improved recognition capabilities to know when and how to appropriately discipline physicians …" Uh, oh. Better watch your back, Jack.

And then, there is a follow-up statement about the "tremendous variance in statutory, funding, judicial, administrative and geographic environments from state to state." In other words, it's a free-for-all when it comes to punishing doctors, with each state conducting business and meting out discipline as it sees fit. A recent study, for example, found considerable variation between states in the questions they asked about mental health on initial applications for licensure.

Probing a physician's mental health is by far the most damaging of all questions. Dr. Lorna Breen was a New York City emergency physician who died by suicide during the COVID-19 pandemic. Her family believes her suicide was directly attributable to her fear of reporting to authorities the mental health treatment she had received and that sanctions would be levied against her license and practice. Fear of disclosure about treatment for mental illness and substance use disorders and how that might affect licensure is a pervasive impediment to seeking psychiatric treatment.

The American Society of Anesthesiologists proposes to distill all questions asked by medical licensure bodies, accrediting organizations, and medical specialty boards that are related to mental and physical health on applications to one question: "Do you have a medical condition that currently impairs your ability to practice medicine?"

This approach provides physicians leeway in three ways. First, it asks about current impairment and eliminates disclosing past history.

Second, the answer does not require an automatic "yes" simply for seeking or accepting mental health treatment. One can answer "no" as long as there is no incapacity to function in a competent, ethical, and professional manner, which is in line with the FSMB recommendation to state medical boards to appropriately differentiate between the illness with which a physician has been diagnosed and the impairments that may result.

Third – and this is a real slippery slope – the doctor could rationalize that mental health treatment is not the equivalent of medical treatment and answer "no" on that basis, but I don't recommend dancing on the head of that pin. The FSMB clearly states: "[T]here is no distinction between impairment that might result from physical and mental illness that would be meaningful in the context of the provision of safe treatment to patients."

However, sometimes creative thinking is needed. Dr. Wible considers herself honest, but she admits to succumbing to 8 of 10 lies she discusses in her op-ed – not only about applications but about work habits, relationships, and self-confidence. Of course, falsification or misrepresentation of any item or response on licensing and credentialing applications is a sufficient basis for denying a license or other privileges.

But physicians don't need punishment; they need licensing officials to back off until their recovery is attained. Most unwell physicians recover, perhaps, except for some sexual predators. In reality, there is

My eyes start to glaze every time I'm bombarded by questions on licensing and credentialing applications. I don't know about you, but when it comes to answering all those questions, I plead the fifth.

*Arthur Lazarus is a former Doximity Fellow, a member of the editorial board of the American Association for Physician Leadership, and an adjunct professor of psychiatry at the Lewis Katz School of Medicine at Temple University in Philadelphia, PA. His forthcoming book is titled Every Story Counts: Exploring Contemporary Practice Through Narrative Medicine.*

TAGGED AS: PSYCHIATRY

< Previous Post
**Who are we losing on the medical education journey? [PODCAST]**

Next Post >
**Revolutionizing medicine: How ChatGPT is changing the way we think about health care**




ADVERTISEMENT

**MORE BY ARTHUR LAZARUS, MD, MBA**

**EXHIBIT C**

**FEDERAL OIG DOCUMENTATION: CAREER CONSEQUENCES OF
MEDICAID/MEDICARE ADVERSE ACTIONS**

The following materials document the federal regulatory framework confirming that adverse Medicaid/Medicare actions and network terminations create mandatory disclosure obligations that materially impair an individual's ability to obtain employment in the healthcare industry. These materials are offered to establish the continuing nature of Plaintiff's injury as alleged in the Second Amended Complaint, Section IV.

The U.S. Department of Health and Human Services Office of Inspector General (OIG) has stated: "Exclusion extensively narrows an individual's employment options with entities that receive Federal health care payments." Federal regulations at 42 C.F.R. Section 424.519 confirm that termination from a Medicaid provider agreement triggers mandatory disclosure obligations regardless of the circumstances or length of time since the action occurred.

The 21st Century Cures Act, effective July 1, 2018, requires that state contracts with managed care organizations such as Magellan include a provision that providers terminated from Medicare, Medicaid, or CHIP may not participate in Medicaid managed care networks. This federal mandate ensures that a single termination from one Medicaid network has cascading disqualification effects across the entire Medicaid managed care industry nationally.

Source document is reproduced on the following page.

Case 2:25-cv-00314-DCN Document 46-1 Filed 06/02/26 Page 27 of 39

An official website of the State of North Carolina **How you know**



🔍

AUGUST 8, 2024

# Refresher: Be Sure to Disclose on Provider Application Exclusion Sanction Questions

GDIT will no longer request supplemental information for undisclosed items discovered during the credentialing and background check process.

Share to:

(/#facebook) (/#email) (/#linkedin) (/#x) (/#bluesky)

GDIT will no longer request supplemental information for undisclosed items discovered during the credentialing and background check process. **Failing to inform NC Medicaid through disclosure on the Exclusion Sanction Information page will lead to automatic denial of the application.** Depending on the type of application submitted, such as a Re-verification application, additional adverse action can occur up to and including termination of the NCTracks provider record.

When the Exclusion Sanction question asks, "Has the applicant, managing employees, owners, or agents **ever**...", it must be answered accurately for anyone listed on the application, and regardless of the length of time since the infraction occurred.

*For example, a reportable infraction that occurred five, 10, or even 20 years prior to the application must be disclosed and accounted for with each application submission. In addition, disclosing an infraction once on one application is not sufficient. As long as the applicant, managing employee, owner or agent remains active on the application, disclosure requirements apply for every application wherein the Exclusion Sanction Information page is displayed for response.*

For every Exclusion Sanction question answered affirmatively, providers must submit a complete copy of the necessary supporting documentation and a written explanation related to the infraction that is signed and dated within six months of the application date.

- This written explanation must be signed by either the individual with the infraction or an Office Administrator (OA) if the infraction is organization related.
- All dates must align between the documentation provided and the dates reported in the application.
- If this documentation is not included with the application, NCTracks will inform the provider of the exact reason why the application was deemed incomplete to include an itemization of the supporting documentation missing from the application.
- Failure to disclose supporting documentation related to an affirmative response will result in a denial of the application.

Additional information is available on the [Exclusion Sanction Questions FAQs page (https://www.nctracks.nc.gov/content/public/providers/faq-main-page/Exclusion-Sanction-Questions-FAQs.html)](https://www.nctracks.nc.gov/content/public/providers/faq-main-page/Exclusion-Sanction-Questions-FAQs.html), including a recently updated Sanctions and Exclusions Fact Sheet.

# Contact

- NCTracks Call Center: 800-688-6696
- Provider Ombudsman: 866-304-7062

# Related Topics:

**EXHIBIT D**

**HEALTHCARE EMPLOYMENT CREDENTIALING DISCLOSURE**

**REQUIREMENTS**

The following document is a representative example of healthcare employment and credentialing disclosure requirements demonstrating that applicants are required to disclose prior adverse participation actions and Medicaid/Medicare network terminations in standard employment and credentialing processes in the behavioral health industry.

LII  > Electronic Code of Federal Regulations (e-CFR)  > Title 42—Public Health
 > CHAPTER IV—CENTERS FOR MEDICARE & MEDICAID SERVICES,
DEPARTMENT OF HEALTH AND HUMAN SERVICES
 > SUBCHAPTER B—MEDICARE PROGRAM
 > PART 424—CONDITIONS FOR MEDICARE PAYMENT
 > Subpart P—Requirements for Establishing and Maintaining Medicare Billing
Privileges
 > **§ 424.519 Disclosure of affiliations.**

# 42 CFR § 424.519 - Disclosure of affiliations.

CFR

### § 424.519 Disclosure of affiliations.

**(a)** *Definitions.* For purposes of this section only, the following terms apply to
the definition of disclosable event in § 424.502:

**(1)** "Uncollected debt" only applies to the following:

**(i)** Medicare, Medicaid, or CHIP overpayments for which CMS or the state has
sent notice of the debt to the affiliated provider or supplier.

**(ii)** Civil money penalties imposed under this title.

**(iii)** Assessments imposed under this title.

**(2)** "Revoked," "Revocation," "Terminated," and "Termination" include situations
where the affiliated provider or supplier voluntarily terminated its Medicare,
Medicaid, or CHIP enrollment to avoid a potential revocation or termination.

**(b)** *General.* Upon a CMS request, an initially enrolling or revalidating provider or supplier must disclose any and all affiliations that it or any of its owning or managing employees or organizations (consistent with the terms "owner" and "managing employee" as defined in § 424.502) has or, within the previous 5 years, had with a currently or formerly enrolled Medicare, Medicaid, or CHIP provider or supplier that has a disclosable event (as defined in § 424.502). CMS will request such disclosures when it has determined that the initially enrolling or revalidating provider or supplier may have at least one such affiliation.

**(c)** *Information.* The provider or supplier must disclose the following information about each reported affiliation:

    **(1)** General identifying data about the affiliated provider or supplier. This includes the following:

        **(i)** Legal name as reported to the Internal Revenue Service or the Social Security Administration (if the affiliated provider or supplier is an individual).

        **(ii)** "Doing business as" name (if applicable).

        **(iii)** Tax identification number.

        **(iv)** NPI.

    **(2)** Reason for disclosing the affiliated provider or supplier.

    **(3)** Specific data regarding the affiliation relationship, including the following:

        **(i)** Length of the relationship.

        **(ii)** Type of relationship.

        **(iii)** Degree of affiliation.

    **(4)** If the affiliation has ended, the reason for the termination.

**(d)** *Mechanism.* The information required to be disclosed under paragraphs (b) and (c) of this section must be furnished to CMS or its contractors via the Form CMS-855 application (paper or the internet-based PECOS enrollment process).

**(e)** *Denial or revocation.* The failure of the provider or supplier to fully and completely disclose the information specified in paragraphs (b) and (c) of this section when the provider or supplier knew or should reasonably have known of this information may result in either of the following:

    **(1)** The denial of the provider's or supplier's initial enrollment application under § 424.530(a)(1) and, if applicable, § 424.530(a)(4).

    **(2)** The revocation of the provider's or supplier's Medicare enrollment under § 424.535(a)(1) and, if applicable, § 424.535(a)(4).

**(f)** *Undue risk.* Upon receiving the information described in paragraphs (b) and (c) of this section, CMS determines whether any of the disclosed affiliations poses an undue risk of fraud, waste, or abuse by considering the following factors:

**(1)** The duration of the affiliation.

**(2)** Whether the affiliation still exists and, if not, how long ago it ended.

**(3)** The degree and extent of the affiliation.

**(4)** If applicable, the reason for the termination of the affiliation.

**(5)** Regarding the affiliated provider's or supplier's disclosable event under paragraph (b) of this section:

 **(i)** The type of disclosable event.

 **(ii)** When the disclosable event occurred or was imposed.

 **(iii)** Whether the affiliation existed when the disclosable event occurred or was imposed.

 **(iv)** If the disclosable event is an uncollected debt:

  **(A)** The amount of the debt.

  **(B)** Whether the affiliated provider or supplier is repaying the debt.

  **(C)** To whom the debt is owed.

 **(v)** If a denial, revocation, termination, exclusion, or payment suspension is involved, the reason for the disclosable event.

**(6)** Any other evidence that CMS deems relevant to its determination.

**(g)** *Determination of undue risk.* A determination by CMS that a particular affiliation poses an undue risk of fraud, waste, or abuse will result in, as applicable, the denial of the provider's or supplier's initial enrollment application under § 424.530(a)(13) or the revocation of the provider's or supplier's Medicare enrollment under § 424.535(a)(19).

**(h)** *Duplicate data.* A provider or supplier is not required to report affiliation data in that portion of the Form CMS-855 application that collects affiliation information if the same data is being reported in the "owning or managing control" (or its successor) section of the Form CMS-855 application.

**(i)** *Undisclosed affiliations.* CMS may apply § 424.530(a)(13) or § 424.535(a)(19) to situations where a disclosable affiliation (as described in § 424.519(b) and (c)) poses an undue risk of fraud, waste or abuse, but the provider or supplier has not yet reported or is not required at that time to report the affiliation to CMS.

[84 FR 47853, Sept. 10, 2019]

**EXHIBIT E**


**PRIVATE EMPLOYER EXCLUSION MONITORING SERVICE**


The following materials are from Verify Comply, a private healthcare compliance company that provides exclusion monitoring services to private healthcare employers. These materials demonstrate that private healthcare companies subscribe to paid third-party services specifically to screen job applicants for prior Medicaid/Medicare adverse actions, confirming that disclosure of a prior network termination creates a barrier to employment across the entire private healthcare sector, not just government programs. This is directly relevant to Plaintiff's allegation that his 200+ job applications have not advanced after mandatory disclosures of Defendants' retaliatory termination.



THE VERIFY COMPLY BLOG

# Employing Individuals on the OIG Exclusion List

**Shannon Kidd** · February 5, 2024

## Playing with Fire

Employing individuals excluded from participation in Federal health care programs can result in devastating repercussions for employers. Numerous organizations have found themselves in an enforcement action opposite the Office of Inspector General (OIG) or a State Agency because of an exclusion monitoring oversight, and it's certainly not a game you want to play.

## Federal and State Agencies Can Exclude Individuals and Entities

The OIG yields the authority to exclude both individuals and entities from participating in federal healthcare programs such as Medicare and Medicaid (in accordance with Sections 1128 and 1156 of the Social Security Act). Associated exclusions typically stem from convictions for fraud, patient abuse, false billing or clinical care issues.

Most states also have statutes authorizing them to exclude parties from participating in state healthcare programs. Many of those states also have their own lists of excluded individuals and entities.

## Heavy Fines

The results of overlooking an exclusion aren't pretty. Fines handed down to organizations that employ or even contract with excluded parties to provide items or services funded by Federal health care programs can quickly add up. This can result in both steep financial repercussions and damage to organizational reputation and credibility. In cases where an employer knew or simply should have known that an individual or entity was on the exclusions list, the OIG can enforce Civil Monetary Penalties (CMPs) of up to $10,000 for EACH individual item or service rendered by an



## A Hit to Organizational Reputation, Integrity and Bottom Line

Just earlier last month, Independence Home Healthcare , was forced to pay $377,000 and agreed to be itself excluded for 20 years for employing an individual listed on the OIG exclusion list and paying improper remuneration.

It's important to know this is not an isolated incident, and the spectrum of financial penalties truly runs the gamut, depending on the specific excluded party employed, capacity of employment, time of employment, and surrounding circumstances. For example, Valley of the Sun Home Healthcare, LLC in Arizona only paid a $21,000 penalty for employing an excluded home health aid, while the Chinese-American Planning Council Home Attendant Program in New York had to pony up nearly one million dollars ($866,000) for employing an excluded personal assistant who provided items or services improperly billed to New York Medicaid.

Prior to hiring or contracting for services and/or items for patients receiving Federal healthcare benefits, it's essential to thoroughly research all involved parties. This will help reduce the risk of employing someone who is prohibited from participating in Federal healthcare programs. However, it's just as important to continue periodic exclusion monitoring of those same individuals even after they are employed or engaged, as the exclusion databases can update at irregular intervals. For example, a provider can be excluded for defaulting on a student loan - which can happen at any time.

Verify Comply knows firsthand how exhausting cyclically checking, double-checking and triple-checking against the various Federal and State exclusions lists can be for employers. That's why we have created a one-stop-shop, where you can search everything you need at in one place and efficiently keep track of your efforts over time. Don't hesitate to contact one of our knowledgeable and experienced staff members to inquire into how we can help your business, organization or facility protect itself from steep penalties and focus on what really matters - continuing to cultivate a successful avenue to quality health care.



Elhadi Benkirane
Plaintiff, Pro Se
7506 Baerss Rd
Riverside, California 92507
Telephone: (562) 391-1442
Benkirane.hadi@gmail.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

ELHADI BENKIRANE,

    Plaintiff,

v.

MAGELLAN HEALTHCARE, INC.;
DAVID WELSH; DAVID TOVAR;
andDOES 1 through 10,

    Defendants.

Case No. 2:25-cv-00314-DCN

**DECLARATION OF ELHADI**
**BENKIRANE**
**IN SUPPORT OF MOTION FOR**
**LEAVE TO FILE SUR-REPLY AND**
**FOR LEAVE TO FILE SECOND**
**AMENDED COMPLAINT**

I,Elhadi Benkirane, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am the Plaintiff in this action, appearing pro se. I have personal knowledge of the facts set forth in this Declaration and could competently testify to them if called as a witness.

2. I served as Executive Director of WHR IOP LLC from its founding until September 1, 2025, when WHR terminated my employment as a direct consequence of Magellan Healthcare's termination of WHR's provider agreement. My annual compensation as Executive Director exceeded $200,000.

3. I have had no contact with WHR IOP LLC since my termination on September 1, 2025. I do not control WHR. I have no authority to act on its behalf. I have no contact information for WHR's current management. I lack authority to cause WHR to appear in this litigation and

have no ability to compel WHR to participate. I did not disobey this Court's Order. Causing WHR to appear as a party is a practical impossibility given these facts.

4. This Court's March 27, 2026 Order (Dkt. 31) granted me "leave" to amend my complaint. I understood "leave" to mean permission. I exercised that permission by filing the First Amended Complaint, which reframed my claims as personal injuries. I did not understand the Court's Order to be a mandate requiring me to add WHR as the only permissible path to cure the standing defect. I acted in good faith.

5. My personal injuries from Defendants' retaliatory conduct are as follows:

a. I lost my position as Executive Director of WHR IOP LLC on September 1, 2025, with annual compensation exceeding $200,000, as a direct result of Defendants' termination of the provider agreement.

b. I was removed by name from the Provider Advisory Committee on June 6, 2025. The removal email specifically identified "Elhadi Benkirane" for exclusion. I received no prior notice and no explanation.

c. Magellan staff made false statements to my patients that WHR had "voluntarily terminated." These statements damaged my personal professional reputation in the community I had served.

d. The May 27, 2025 termination letter was addressed to "Elhadi Benkirane, OWNER," not to WHR IOP LLC as a corporate entity. This is one of several facts demonstrating that Defendants directed their conduct at me personally.

6. Since September 1, 2025, I have submitted applications for more than 200 positions in the behavioral health industry. I have applied for positions, including but not limited to Executive Director, Behavioral Health Administrator, Compliance, and Managed Care roles. I have applied for positions substantially below my prior compensation level and below my prior executive rank. Despite my extensive experience in behavioral health administration, I have not received a single interview in response to any of these applications.

7. Every one of the more than 200 applications I submitted required me to disclose whether I had previously been removed from a Medicaid network, had a provider agreement terminated, or had been subject to adverse participation actions. In every application, I truthfully disclosed Defendants' actions. After making these disclosures, I received no interviews and no advancement of any application.

8. Prior to Defendants' actions, I had worked in behavioral health administration for years and had never been required to disclose any Medicaid network termination, adverse participation action, or comparable credentialing event. The obligation to make these disclosures, and the resulting inability to obtain employment, are direct consequences of Defendants' retaliatory conduct directed at me personally.

9. I have retained records of these applications and the rejections I received and can produce them in discovery.

10. I have had zero income since September 1, 2025, as a direct result of Defendants' retaliatory conduct directed at me personally. The denial of any judicial remedy would leave me without any means of redress for violations of my constitutional rights.

11. I have reviewed the proposed Second Amended Complaint attached as Exhibit A to this motion. To the best of my knowledge, the factual allegations therein are true and accurate.

Ideclare under penalty of perjury that the foregoing is true and correct.

Executed on _____June 2nd_____, 2026, at Riverside, California.

*Benkirane*

/s/ Elhadi Benkirane

ELHADI BENKIRANE

Plaintiff, Pro Se