ELHADI BENKIRANE
7506 Baerss Rd
Riverside, CA 92507
 562.391.1442
benkirane.hadi@gmail.com
Plaintiff, Pro Se

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **ELHADI BENKIRANE,** | **Case No. 2:25-cv-00314-DCN** |
| Plaintiff, | |
| vs | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE SUR-REPLY AND SECOND AMENDED COMPLAINT (DKT. 46)** |
| **MAGELLAN   HEALTHCARE, INC.; DAVID  WELSH; DAVID TOVAR; and DOES 1-10,** | |
| Defendants. | |

## I. INTRODUCTION

1.  Plaintiff Elhadi Benkirane respectfully submits this Memorandum in Support of his Motion for Leave to File a Sur-Reply and Second Amended Complaint (SAC) (Dkt. 46). The proposed SAC and supporting evidentiary record containing Exhibits A through X were previously filed under Docket Entry No. 46, Attachment 1. Additional supplemental exhibits (Exhibits 1 through 3) were filed under Docket Entry No. 44, Attachment 2. Plaintiff's Statement of Material Facts and Exhibit List were filed under Docket Entry No. 43, Attachments 1 and 2. New supplemental Exhibits Y through AA are filed concurrently with this Memorandum.

2.  The purpose of this memorandum is to demonstrate how the documentary record and the proposed SAC clarify the structural, contractual, and regulatory framework governing the Idaho Behavioral Health Plan (IBHP). Rather than relying on mere

speculation, the SAC incorporates explicit state records, public registries, and internal corporate correspondence to address the specific pleading thresholds raised in Defendants' Motion to Dismiss (Dkt. 40) and Reply Brief (Dkt. 45). Because the SAC properly delineates the state-delegated authority, procedural non-compliance, individual professional barriers, and critical constitutional doctrines resulting from the network exclusion, justice requires that Plaintiff's Motion for Leave be granted.

## II. LEGAL STANDARD FOR LEAVE TO AMEND

3. Under Federal Rule of Civil Procedure 15(a)(2), a party may amend its pleading with the court's leave, which "[t]he court should freely give when justice so requires." The Ninth Circuit applies this policy with "extreme liberality," favoring amendments that clarify the issues, bring forth relevant documentary evidence, and resolve threshold jurisdictional or standing questions. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Leave to amend should only be denied upon a clear showing of bad faith, undue delay, or severe prejudice to the opposing party. Where a proposed amendment incorporates concrete documentary exhibits that substantiate colorable constitutional and state-law claims, leave to amend is the proper procedural mechanism.

## III. MASTER INDEX OF EXHIBITS ON THE RECORD

4. The following exhibits, previously filed on the Court's docket and supplemented concurrently herewith, provide the definitive structural and historical framework for the allegations set forth in the SAC:

### EXHIBITS A THROUGH X (Dkt. 43, Att. 2)

- **Exhibit A (Dkt. 43, Att. 2, Page 7):** IBHP Care Guidelines (Formal Protections). Establishes formal provider complaint systems, investigation mandates, and explicit protections against punitive actions.

- **Exhibit B (Dkt. 43, Att. 2, Pages 8 through 13):** IBHP Provider Handbook Supplement. Outlines mandatory site-visit notice timelines, QAPI procedures, and sequential inquiry/review protocols.

- **Exhibit C (Dkt. 43, Att. 2, Pages 14 through 17):** May 2025 Email Exchange. Documents the operational conversion of site visits and formal inquiries regarding regional enforcement equity.

- **Exhibit D (Dkt. 43, Att. 2, Page 18):** David Tovar Public Profile. Identifies Defendant Tovar's concurrent professional role within a regional behavioral health entity.

- **Exhibit E (Dkt. 43, Att. 2, Pages 19 through 24):** IBHP State Contract Amendment No. 1. Documents the $1.216B state contract, state personnel mandates, and executive implementation authority.

- **Exhibit F (Dkt. 43, Att. 2, Pages 25 through 26):** Magellan Internal Credentialing Roster. Verifies the active network credentialing status of WHR core medical and clinical staff.

- **Exhibit G (Dkt. 43, Att. 2, Pages 27 through 30):** May 19, 2025 Formal Deficiency Letter. Itemizes the ten administrative and operational categories serving as the basis for network action.

- **Exhibit H (Dkt. 43, Att. 2, Pages 31 through 32):** Idaho Secretary of State Annual Corporate Report. Official state corporate filing documenting the management structure of Treasure Valley Counseling and Wellness PLLC, listing Defendant Tovar as Manager.

- **Exhibit I (Dkt. 43, Att. 2, Page 33):** June 6, 2025 Committee Expulsion Notice. Documents the operational removal of Plaintiff from the regional Provider Advisory Committee.

- **Exhibit J (Dkt. 43, Att. 2, Pages 34 through 35):** May 27, 2025 Immediate Termination Letter. Issued by Defendant Welsh; establishes individual operational notice and administrative appeal terms.

- **Exhibit K (Dkt. 43, Att. 2, Page 36):** May 27, 2025 Proactive Remediation Log. Verification log of Plaintiff's ten-category operational remediation plan submitted at 10:12 a.m.

- **Exhibit L (Dkt. 43, Att. 2, Pages 37 through 40):** May 2025 Personnel Adjustment Emails. Documents the onboarding of licensed professional counselors and full-time clinical staff.

- **Exhibit M (Dkt. 43, Att. 2, Page 41):** State-Actor Admission Clause. Explicit handbook text defining the operational partnership with IDHW as the statewide administrator.

- **Exhibit N (Dkt. 43, Att. 2, Pages 42 through 43):** March 27, 2025 Pre-Litigation Notice. Formal written notice regarding outstanding out-of-network claims delays and dispute escalation.

- **Exhibit O (Dkt. 43, Att. 2, Pages 44 through 49):** May 27, 2025 Substantive Appeal Letter. Formal 6-page administrative contest outlining statutory, regulatory, and constitutional objections.

- **Exhibit P (Dkt. 43, Att. 2, Page 50):** Official PAC Minutes (May 22, 2025). Documents the tracking of provider advisory committee attendance under the direction of Defendant Tovar.

- **Exhibit Q (Dkt. 43, Att. 2, Page 51):** Appeal Update Request (July 7, 2025). Written administrative inquiry tracking the status of the appeal and network equity concerns.

- **Exhibit R (Dkt. 43, Att. 2, Page 52):** Internal Audit Summary (May 29, 2025). Post-enforcement internal ledger detailing site-visit personnel and operational review scope.

- **Exhibit S (Dkt. 43, Att. 2, Page 53):** Network Status Verification (February 21, 2025). Official network correspondence verifying Plaintiff's compliance baseline and good standing.

- **Exhibit T (Dkt. 43, Att. 2, Page 54):** Contract Execution Chain (February 2025). Verification of systemic configuration including TIN, billing chains, and ASAM alignment.

- **Exhibit U (Dkt. 43, Att. 2, Page 55):** Formal Billing Demand Ledger (March 26, 2025). Detailed financial summary itemizing $146,831.02 in outstanding out-of-network claims.

- **Exhibit V (Dkt. 43, Att. 2, Page 56):** Irreparable Harm Update (August 25, 2025). Documents the operational and clinical impacts resulting from the three-month appeal suspension.

- **Exhibit W (Dkt. 43, Att. 2, Page 57):** Federal NPI Public Registry Printout. Official National Provider Identifier registry data linking family leadership to Treasure Valley Counseling.

- **Exhibit X (Dkt. 43, Att. 2, Page 58):** IDHW Procurement Bid Records. Public procurement records documenting the evaluation framework for the statewide IBHP contract.

## EXHIBITS 1 THROUGH 3 (Dkt. 44, Att. 2)

- **Exhibit 1 (Dkt. 44, Att. 2):** BH Business article (February 17, 2026) regarding Magellan Health becoming independent under Madison Health Group.

- **Exhibit 2 (Dkt. 44, Att. 2):** California Office of Health Care Affordability Material Change Transaction Notice concerning Centene Corporation/Madison Health Group, filed by Crowell and Moring LLP.

- **Exhibit 3 (Dkt. 44, Att. 2):** Idaho Department of Health and Welfare Behavioral Health Managed Care Providers webpage screenshot (May 29, 2026).

## <u>NEW EXHIBITS FILED CONCURRENTLY WITH THIS MEMORANDUM</u>

- **Exhibit Y (Filed herewith):** CMS Medicaid Provider Enrollment Compendium (MPEC) screening criteria and **42 C.F.R. § 455.106** mandatory disclosure requirements. Establishes the federal regulatory mechanism that automatically transforms a "for cause" MCO termination into a permanent employment barrier across all federally funded healthcare programs.

- **Exhibit Z (Filed herewith):** State Medicaid enrollment disclosure page demonstrating the practical operation of the mandatory screening barrier, including automatic denial language for applicants who fail to disclose prior MCO terminations for cause.

- **Exhibit AA (Filed herewith):** Current Idaho Department of Health and Welfare website screenshot directing all Idaho citizens seeking behavioral health services to contact Magellan Healthcare directly, establishing that Magellan functions as the State's public-facing point of contact for the delivery of mandatory Medicaid behavioral health services.

# IV. HOW THE SAC CURES ALL PURPORTED PLEADING DEFICIENCIES

**A. The SAC Establishes Clear Federal State-Action Under 42 U.S.C. § 1983 Through Five Converging Precedents**

5. Defendants contend that their status as private corporations shields them from constitutional claims under § 1983. The proposed SAC effectively addresses this threshold by deploying five distinct, binding frameworks established by the Supreme Court and the Ninth Circuit:

6. **The Continuity of Governmental Power (*West v. Atkins* Framework):** Under *West v. Atkins*, 487 U.S. 42 (1988), private professionals who fulfill state statutory obligations carry state-actor liability. The proposed SAC establishes that the state did not diminish its power; it merely transferred its execution. Defendant Welsh previously administered this exact regulatory infrastructure as a public official for the Idaho Department of Health and Welfare (IDHW) (**Exhibit X, Dkt. 43, Att. 2**). Upon moving to Magellan to execute the same program under the $1.216B state contract (**Exhibit E, Dkt. 43, Att. 2**), his enforcement power remained identical. The only change was the corporate badge on his letterhead (**Exhibit J, Dkt. 43, Att. 2**).

7. **The Delegated Public Function (*Halleck* Distinction):** While *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) notes that private operations are generally exempt, it explicitly preserves state-actor status for entities performing a function that the State is legally and constitutionally obligated to provide. Under federal and state Medicaid mandates, Idaho is legally required to provide a functional, statewide behavioral health delivery system. By contractually handing over the entirety of this state obligation to a single vendor (**Exhibit E, Exhibit M, Dkt. 43, Att. 2**), Magellan

performs a compulsory public function. The current IDHW website confirms this by directing all Idaho citizens seeking behavioral health services to contact Magellan directly (**Exhibit AA, filed herewith**).

8. **The Absolute Monopolistic Market (*Gonzalez-Maldonado* Distinction):** Defendants rely on cases involving multi-vendor Managed Care Organizations (MCOs), such as *Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244 (1st Cir. 2012), where providers can switch networks. The proposed SAC identifies a completely distinct regulatory architecture: Idaho operates an exclusive, single-source statewide contract monopoly (**Exhibit E, Dkt. 43, Att. 2**). There are no competing MCO alternatives in the state of Idaho; an exclusion by Magellan operates as an absolute state-enforced banishment from the market.

9. **Pervasive Administrative Intertwining (*Rawson* & *Brentwood* Tests):** Under *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 951 (9th Cir. 2020) and *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001), pervasive state entanglement transforms private enforcement into state action. **Exhibit E (Dkt. 43, Att. 2)** establishes that the state retains structural vetoes over Magellan's executive personnel shifts, while **Exhibit B (Dkt. 43, Att. 2)** binds Magellan's QAPI audit machinery to act strictly "as directed by IDHW" using "IDHW-approved policies and procedures."

10. **The Retrospective State Fair Hearing Mechanism (*Catanzano* Anchor):** Under the binding principles of *Catanzano v. Wing*, 277 F.3d 99 (2d Cir. 2001), when a private administrator's network and clinical determinations are directly appealable to and reviewable by State Administrative Law Judges (ALJs), the administrator is legally functioning as an arm of the state. Because Magellan's credentialing and termination

decisions are ultimately integrated into the state's Medicaid fair hearing process, state action is firmly established.

11. **The Crowell and Moring Contradiction (Exhibit 2, Dkt. 44, Att. 2):** Defendants' own counsel, Crowell and Moring LLP, simultaneously represents Defendants in this litigation while filing a Material Change Transaction Notice with the California Office of Health Care Affordability on behalf of Centene Corporation and Magellan Health entities. That regulatory filing acknowledges that state governmental approval is required before Magellan's corporate ownership can change hands. Defendants cannot simultaneously argue in this Court that Magellan is a purely private actor while their own attorneys acknowledge to state regulators that governmental approval is a prerequisite for corporate transactions involving Magellan's operations.

## B. The SAC Documents Explicit Violations of Federal Mandates (42 C.F.R. § 438.214)

12. Defendants assert that network composition is a matter of private corporate discretion. The proposed SAC cures this by identifying the specific federal statutory boundaries governing Defendants' actions. Under **42 C.F.R. § 438.214**, the federal government imposes a strict, mandatory statutory duty upon states to maintain continuous oversight over all MCO network provider selection and credentialing decisions. This federal mandate ensures that private administrators cannot deploy selective enforcement or arbitrary credentialing schemes to disrupt the public health safety net. By documenting a systematic deviation from standard credentialing protocols (**Exhibit B, Exhibit C, Dkt. 43, Att. 2**), the SAC demonstrates that Defendants actively violated the federal statutory architecture meant to prevent arbitrary network ousters.

### C. The SAC Properly Formulates a Prima Facie Case of First Amendment Retaliation

13. Defendants argue that the contract termination was an independent, standard quality-control action. The SAC incorporates chronologically sequential facts that establish an unassailable causal baseline:

14. **Established Compliance Status:** On February 21, 2025, Magellan formally confirmed that Plaintiff's operations were in "good standing" with zero outstanding compliance issues (**Exhibit S, Exhibit T, Dkt. 43, Att. 2**).

15. **The Payment Backlog Trigger:** On March 26, 2025, Plaintiff finalized a Formal Billing Demand Ledger itemizing **$146,831.02** in outstanding, delayed out-of-network reimbursements (**Exhibit U, Dkt. 43, Att. 2**).

16. **The Direct Admission of Knowledge:** Crucially, during an official regional Provider Advisory Committee (PAC) assembly, Defendant Welsh explicitly acknowledged the existence of this major systemic payment backlog. Merely **five days** after Welsh publicly addressed this financial dispute, and immediately following Plaintiff's formal legal demand (**Exhibit N, Dkt. 43, Att. 2**), Defendants accelerated an unannounced compliance audit targeting the exact provider who demanded payment (**Exhibit C, Exhibit J, Dkt. 43, Att. 2**).

17. The immediate temporal proximity between the public acknowledgement of the payment dispute and the sudden escalation of network sanctions satisfies the requisite pleading standards for causation within the Ninth Circuit. See *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (temporal proximity of less than three months sufficient to establish prima facie case of retaliatory intent). Here, the gap between protected speech and termination is 61 days.

18. The predetermined nature of the termination is conclusively established by the documentary record. Magellan's deficiency letter of May 19 stated expressly that Magellan was "continuing our internal review and evaluation to determine the appropriate course of action." (**Exhibit G, Dkt. 43, Att. 2.**) Despite that explicit representation, and despite Plaintiff notifying Defendants of full remediation on May 25 and submitting comprehensive documentation of all ten categories on May 27 at 10:12 AM (**Exhibit K, Dkt. 43, Att. 2**), Defendants issued the termination letter the same morning. The termination letter itself invites Plaintiff to seek future re-entry "once all identified deficiencies have been fully remediated," yet Defendants issued that letter on the same morning Plaintiff submitted documented proof of full remediation of all ten deficiencies. This internal contradiction on the face of the letter is conclusive evidence of pretext.

19. Furthermore, Magellan's own internal credentialing records confirm that at the time of termination, WHR had four credentialed providers on file, including two physicians (MD), one Master of Social Work (MSW), and one Master of Arts (MA) (**Exhibit F, Dkt. 43, Att. 2**), directly contradicting the stated basis for termination that "multiple staff providing services lack the required credentials or degrees." See *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (procedural deviations and contradictory evidence support inference of pretext).

20. Additionally, Magellan's own published Care Guidelines expressly prohibit "any punitive action against any provider who requests or supports an appeal." (**Exhibit A, Dkt. 43, Att. 2.**) Plaintiff filed an appeal and sent a pre-litigation letter asserting constitutional rights. Defendants terminated Plaintiff and removed him from the Provider Advisory

Committee. This constitutes a direct violation of Defendants' own anti-retaliation policy, further establishing retaliatory motive.

### D. Detailed Procedural Violations Establishing Pretext

21. The documentary record establishes that Defendants bypassed every mandatory procedural safeguard required by their own governing documents, further demonstrating that the termination was pretextual:

22. **No Advance Notice:** The Provider Handbook requires a minimum of two weeks' advance written notice before any site visit (**Exhibit B, Dkt. 43, Att. 2**). Defendants conducted an unannounced audit on May 1, 2025, with zero advance notice (**Exhibit C, Dkt. 43, Att. 2**).

23. **No 90-Day Corrective Action Period:** The IBHP contract mandates a 90-day corrective action period before any termination for cause (**Exhibit E, Dkt. 43, Att. 2**). Defendants terminated Plaintiff 8 days after the deficiency letter, violating this mandatory requirement by 82 days.

24. **No Sequential Pre-Termination Process:** The Provider Handbook requires a sequential process consisting of informal inquiry, formal review, corrective action plan, and only then termination as a last resort (**Exhibit B, Dkt. 43, Att. 2**). Defendants skipped directly from deficiency letter to immediate termination, bypassing every intermediate step.

25. **Illusory Appeal Process:** The termination letter directed Plaintiff to submit his appeal to Defendant Welsh (**Exhibit J, Dkt. 43, Att. 2**), the same individual who personally signed the termination letter. This is a textbook denial of an impartial decision-maker. Defendants then failed to respond to the timely filed appeal for over 90 days (**Exhibit Q, Dkt. 43, Att. 2**), rendering the appeal process entirely illusory.

26. Welsh's termination letter expressly states that Magellan will review a future application from Plaintiff "once all identified deficiencies have been fully remediated." This is a direct admission that Welsh personally controls Plaintiff's future re-entry into the profession, confirming that the injury is ongoing, personal to Plaintiff, and not merely a corporate contract dispute.

### E. Defendant Welsh's Individual Conduct

27. Defendant Welsh is not merely a corporate figurehead. He is personally responsible for the following discrete acts that directly injured Plaintiff:

28. Welsh served as the IDHW official who evaluated the competitive bids for the $1.216 Billion IBHP contract (**Exhibit X, Dkt. 43, Att. 2**). He then left state service to join Magellan as Executive Director of the same program he helped award, carrying the same regulatory authority under a different employer.

29. Welsh personally signed the May 27, 2025 termination letter addressed to "Elhadi Benkirane, Owner" (**Exhibit J, Dkt. 43, Att. 2**). His official title on that letter is "Executive Director, Idaho Behavioral Health Plan," a state program title that demonstrates he exercises delegated state authority, not merely private corporate discretion.

30. Welsh designated himself as the appeal reviewer for the termination he personally authorized (**Exhibit J, Dkt. 43, Att. 2**), denying Plaintiff any impartial review of the decision.

31. Welsh publicly acknowledged the systemic payment backlog at the PAC meeting, demonstrating personal knowledge of the financial dispute, then initiated enforcement against the exact provider who demanded payment.

**F. Defendant Tovar's Individual Conduct and Conflict of Interest**

32. Defendant Tovar is not merely a passive participant. He is personally responsible for the following discrete acts that directly injured Plaintiff:

33. Tovar served as IDHW Bureau Chief overseeing the IBHP before joining Magellan as Network Manager (**Exhibit D, Dkt. 43, Att. 2**). He exercises the same regulatory authority he held as a state official, now under Magellan's corporate structure.

34. Tovar signed the May 19, 2025 Notification of Deficiencies (**Exhibit G, Dkt. 43, Att. 2**) while simultaneously maintaining a direct financial interest in Treasure Valley Counseling and Wellness PLLC, a competing behavioral health clinic serving the same Medicaid population in the same geographic region (**Exhibit D, Exhibit H, Dkt. 43, Att. 2**).

35. On June 2, 2025, Tovar filed an Annual Report with the Idaho Secretary of State listing himself as Manager of Treasure Valley Counseling (**Exhibit H, Dkt. 43, Att. 2**). Four days later, on June 6, 2025, Tovar's office removed Plaintiff from the Provider Advisory Committee (**Exhibit I, Dkt. 43, Att. 2**). This 4-day sequence demonstrates that Tovar was actively managing his competing business while simultaneously exercising state-delegated regulatory authority to eliminate a market competitor.

36. The Federal NPI Registry confirms that Treasure Valley Counseling is held within Tovar's immediate household (**Exhibit W, Dkt. 43, Att. 2**), demonstrating that the regulatory mechanisms used to exclude Plaintiff from the market operated to the direct economic benefit of the reviewer's private concern.

**G. The Proposed SAC Cures Due Process Deficiencies Through the Stigma-Plus Doctrine**

37. Defendants contend that the termination of a provider contract does not implicate a constitutionally protected liberty interest. The proposed SAC completely overthrows this defense by pleading a textbook case under the federal Stigma-Plus Doctrine, governed by *Paul v. Davis*, 424 U.S. 693 (1976) and *Ulrich v. City & County of San Francisco*, 308 F.3d 968 (9th Cir. 2002).

38. Under *Ulrich*, a public or state-delegated professional termination violates a plaintiff's liberty interest if it satisfies a two-part framework: (1) the termination is accompanied by a stigmatizing charge that damages the professional's good name, reputation, honor, or integrity, and (2) it is structurally linked to the denial of a tangible legal right or status. The SAC meets both prongs explicitly:

39. **The Stigma:** Defendants did not issue a routine, no-cause non-renewal. They executed an immediate, acute termination for profound clinical and operational cause (**Exhibit J, Dkt. 43, Att. 2**), alleging ten severe categories of institutional deficiency (**Exhibit G, Dkt. 43, Att. 2**). This stigmatizing designation was published throughout Magellan's internal networks and reported to regulatory bodies, severely tarnishing Plaintiff's unblemished professional standing.

40. **The Plus (Absolute Job Barrier):** This stigma was directly coupled with an operational "plus" consisting of the total imposition of an absolute barrier to employment. Because Magellan operates as the exclusive, single-source statewide administrator for the entire $1.216 Billion Idaho Behavioral Health Plan (**Exhibit E, Exhibit M, Dkt. 43, Att. 2**), an unresolved, bad-faith "for cause" termination operates as an insurmountable professional wall. It strips Plaintiff of his ability to direct services, maintain credentials,

or secure employment within the public behavioral health industry across the entire state of Idaho.

### H. Integration of New Elements: The Imposition of an Absolute Liberty and Job Barrier

41. A critical deficiency cured by the proposed SAC is the detailed articulation of the unconstitutional liberty and job barriers imposed on Plaintiff. Exhibits P through X (**Dkt. 43, Att. 2**) and new Exhibits Y through AA (**filed herewith**) introduce entirely new elements proving that Defendants' actions went far beyond a localized corporate separation, effectively imposing an absolute regulatory barrier to Plaintiff's continued employment and professional standing within his chosen field:

42. **The Dual Regulatory Blacklist Trap as a New Element:** Defendants erroneously argue that the termination was a localized, private contract matter that did not infringe upon protected liberty interests. However, the SAC incorporates specific, mandatory federal and state regulatory elements that transform this "for cause" designation into an absolute statutory bar to future employment. Specifically, under federal mandate **42 C.F.R. § 455.106**, any entity receiving federal Medicaid funds is legally required to screen and disclose whether any applicant or managing employee has ever been terminated for cause from a prior Medicaid provider agreement (**Exhibit Y, filed herewith**). Concurrently, under Idaho Medicaid enrollment regulations (**IDAPA 16.03.09**), new applicants seeking enrollment or employment within the state infrastructure must explicitly disclose any prior managed care organization (MCO) terminations for cause. By executing an immediate "for cause" termination (**Exhibit J, Dkt. 43, Att. 2**) and intentionally suspending the administrative appeal process for over 90 days (**Exhibit Q, Dkt. 43, Att. 2**), Defendants did not merely terminate a single

agreement; they triggered a mandatory regulatory disclosure trap. Because Magellan holds the exclusive, single-source statewide contract for the $1.216 Billion Idaho Behavioral Health Plan (**Exhibit E, Exhibit M, Dkt. 43, Att. 2**), this "for cause" designation activates a dual-layered regulatory barrier that automatically blacklists Plaintiff from securing new employment or maintaining credentials across the entire public behavioral health industry (**Exhibit Z, filed herewith**).

43. **Removal from Public Governance Structures (Exhibit I, Exhibit P, Dkt. 43, Att. 2):** This professional barrier is reinforced by the documentary evidence showing that Defendants extended their sanctions beyond clinical operations to strip Plaintiff of his broader professional standing. On June 6, 2025, Defendant Tovar's office issued an automated notice summarily expelling Plaintiff from his seat on the Idaho Provider Advisory Committee (PAC 3) (**Exhibit I, Dkt. 43, Att. 2**). The official minutes from May 22, 2025, show that this ouster was structurally implemented through retrospective absence tracking overseen by Tovar while he chaired the advisory body (**Exhibit P, Dkt. 43, Att. 2**), separating Plaintiff from the regulatory and governance bodies of his profession.

44. **Objective Pretext and Overlapping Professional Conflict (Exhibit D, Exhibit H, Exhibit W, Dkt. 43, Att. 2):** The SAC establishes that this absolute job barrier was manufactured through a systemically conflicted process. Defendant Tovar issued the underlying "Notification of Deficiencies" (**Exhibit G, Dkt. 43, Att. 2**) while concurrently maintaining a direct professional and financial interest in Treasure Valley Counseling and Wellness PLLC, an active market competitor located in Nampa, Idaho (**Exhibit D, Exhibit H, Dkt. 43, Att. 2**). Public records from the Federal NPI Registry (**Exhibit W, Dkt. 43, Att. 2**) confirm that this competing entity is directly held within

Tovar's immediate household, demonstrating that the regulatory mechanisms used to exclude Plaintiff from the market operated to the direct economic benefit of a reviewer's private concern.

45. **Systemic Procurement Framework (Exhibit X, Dkt. 43, Att. 2):** This pattern of overlapping authority is further illuminated by public procurement records from the Idaho Department of Health and Welfare (**Exhibit X, Dkt. 43, Att. 2**). These state records reveal that Defendant David Welsh served as the state official responsible for evaluating the competitive corporate bids for this exclusive, state-wide IBHP contract infrastructure. Immediately following the evaluation and award of this massive $1.216 Billion state monopoly, Welsh transitioned from state service to execute the exact same contract on behalf of Magellan (**Exhibit E, Dkt. 43, Att. 2**), reinforcing the public-state nature of the regulatory framework that ultimately barred Plaintiff from his profession.

## I. The Proposed SAC Properly Establishes Individual Standing and Intermediary Retaliation

46. Defendants assert that Plaintiff lacks standing to maintain this action individually because the underlying network agreements were executed under corporate structures. The proposed SAC definitively resolves this ambiguity through two distinct doctrines:

47. **Direct Individual Injury:** The formal Notice of Termination signed by Defendant Welsh was explicitly directed to Plaintiff in his personal and professional capacity: "Attn: Elhadi Benkirane, Owner" (**Exhibit J, Dkt. 43, Att. 2**). Furthermore, Defendant Welsh's official state program title, "Executive Director, Idaho Behavioral Health Plan," demonstrates that his actions carried the direct authority of a state program, rather than an abstract corporate entity. Because the administrative and regulatory exclusions

directly barred Plaintiff from his individual livelihood and professional office, personal standing is firmly established.

48. **Third-Party/Intermediary Retaliation Standing:** Under the binding core principle of *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011), standing to sue for unlawful retaliation is extended to individuals who suffer direct, intentional personal injury as a result of a defendant targeting a closely connected intermediary entity. Even if the contract itself was technically held under a corporate matrix, the SAC incorporates documented facts demonstrating that Defendants directed their sanctions directly at Plaintiff's individual professional status and governing advisory positions to achieve their retaliatory objectives, placing him squarely within the zone of interests protected by the Constitution.

49. The Supreme Court's holding in *NAACP v. Alabama*, 357 U.S. 449, 459 (1958) is directly controlling: constitutional rights are personal and cannot be defeated by routing governmental action through organizational intermediaries. If Defendants could not retaliate against Plaintiff directly for his protected speech, they cannot accomplish the same result by routing the retaliation through his employer's contract and then arguing that only the corporate entity has standing to complain. Defendants' reliance on *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006) is misplaced. *Domino's* is a Section 1981 statutory contract case governing contractual privity. Section 1983 requires no contractual privity; it requires only that the human plaintiff suffered a deprivation of constitutional rights under color of law. Moreover, the Supreme Court in *Domino's* expressly declined to reject the "actual target" theory of standing where individual constitutional liberties are explicitly compromised by a state-delegated enforcement action.

## V. CONCLUSION

50. The documentary evidence and new regulatory elements filed on the record provide a precise, clear, and objective framework that removes Plaintiff's claims from the realm of speculation and elevates them to a standard of clear plausibility. The proposed Second Amended Complaint seamlessly incorporates these contracts, explicit regulatory mandates under **42 C.F.R. § 455.106** and **IDAPA 16.03.09**, public registries, and administrative records to fully address and cure the pleading deficiencies raised by the defense. Denying leave to amend under these circumstances would run counter to the liberal amendment policies of Rule 15 and prevent the proper judicial review of a documented, state-delegated regulatory framework that has imposed an absolute professional barrier.

For the foregoing reasons, Plaintiff Elhadi Benkirane respectfully requests that this Court **GRANT** his Motion for Leave to File a Sur-Reply and Second Amended Complaint (Dkt. 46).

Dated: June 12, 2026

Respectfully submitted,

*/s/ Elhadi Benkirane*
Elhadi Benkirane, Pro Se
Riverside, California

## CERTIFICATE OF SERVICE

I, Elhadi Benkirane, hereby certify that on June 12, 2026, I electronically filed the following documents with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record:

1. Plaintiff's Memorandum in Support of Motion for Leave to File Sur-Reply and Second Amended Complaint (Dkt. 46)

2. Exhibit Y: CMS Medicaid Provider Enrollment Compendium (MPEC) Screening Criteria and 42 C.F.R. § 455.106 Mandatory Disclosure Requirements

3. Exhibit Z: State Medicaid Enrollment Disclosure Page Demonstrating Mandatory Screening Barrier

4. Exhibit AA: Current Idaho Department of Health and Welfare Website Screenshot Directing Citizens to Contact Magellan Healthcare for Behavioral Health Services

The above documents were served via the Court's CM/ECF electronic filing system upon all parties who have appeared and registered in this action, including:

**Kim J. Trout, ISB# 2468**
**Alyssa R. Jones, ISB# 12181**
**TROUT & JONES PLLC**
**3778 N. Plantation River Dr., Suite 101**
**Boise, Idaho 83703**
**Telephone: (208) 577-5755**
**Email: service@trout-law.com**

Counsel for Defendants Magellan Healthcare, Inc., David Welsh, and David Tovar

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June 12, 2026

/s/ Elhadi Benkirane

Elhadi Benkirane
7506 Baerss Rd
Riverside, CA 92507
Telephone: 562.391.1442
Email: benkirane.hadi@gmail.com
Plaintiff, Pro Se